**ENCYCLOPAEDIA BRITANNICA, INC.,**
Plaintiff-Appellant,

v.

**SS HONG KONG PRODUCER,** her engines, etc., and Universal Marine Corporation, Defendant-Appellee.

No. 10, Docket 33495.

United States Court of Appeals Second Circuit.

Argued Sept. 15, 1969.

Decided Oct. 30, 1969.

* Hon. Warren J. Ferguson, United States District Judge, Los Angeles, California, sitting by designation.

F. Herbert Prem, New York City (Bigham, Englar, Jones & Houston, New York City, on the brief), for appellant.

John J. Sullivan, New York City (Mendes & Mount, New York City, on the brief), for appellee.

Before MOORE, HAYS and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge:

This case concerns a claim for damage by breakage and sea water to approximately 1300 cartons of encyclopedias shipped by the appellant, Britannica, from New York to its affiliate in Yokohama, Japan. The damaged cartons were a part of a shipment of 4080 cartons of books, sent by appellant from its Chicago plant to its agent in New York, United Cargo Corp., which packed the cartons into seven separately numbered, metal containers, 17' x 8' x 8', and one smaller metal pallet container, also numbered. On December 2, 1964 United delivered the containers to S.S. Hong Kong Producer, owned and operated by appellee, Universal Marine Corporation, which received the shipment on board in "apparent good order and condition" and issued a "short form" bill of lading. Unknown to Britannica and United only two of the containers were stowed below deck while six were stowed on the weather deck. The short form bill in itself contained no notice or statement that the containers were to be carried as deck cargo or that they might be so carried, but it incorporated by reference [1] all of

---

1. The provisions of the short form bill are as follows:

RECEIVED the goods, or packages, said to contain goods herein mentioned, in apparent good order and condition unless otherwise indicated, to be transported and delivered or transhipped as herein provided.

This Short Form Bill of Lading is issued for the shipper's convenience and at its request, instead of the carrier's regular form of Bill of Lading. It shall have effect subject to the provisions of the U. S. Carriage of Goods by Sea Act 1936, or of the Carriage of Goods by Sea or similar Act in force in the locality where this Bill of Lading is issued, so far as they may be applicable.

All the terms of the carrier's regular form of Bill of Lading are incorporated herein with like force and effect as if they were written at length herein. A copy of such Bill of Lading may be obtained from the carrier, its agents or the master.

All agreements or freight engagements for shipment of goods are superseded by this Bill of Lading and all its terms, whether written, typed, stamped or printed, or incorporated by reference are agreed by the shipper to be binding and to govern the relations, whatever they may be, between those included in

the terms of the carrier's regular form of bill of lading. Of this regular form the portion which is at the center of the controversy in this case, is Clause 13, of which Britannica claims to have been wholly unaware but which reads, in full, as follows:

"13. STOWAGE ON DECK, ETC.— Goods stowed in poop, forecastle, deckhouse, shelter deck, passenger space, storeroom, bunker space, or any other covered-in space shall be deemed to be stowed under deck for all purposes, including General Average.

The shipper represents that the goods covered by this bill of lading need not be stowed under deck and it is agreed that it is proper to and they may be stowed on deck unless the shipper informs the carrier in writing before delivery of the goods to the carrier that under deck stowage is required.

With respect to goods carried on deck, all risk of loss or damage by perils inherent in or to incidental [sic] such carriage shall be borne by the shipper and the carrier shall have the benefit of all the terms of this bill of lading not inconsistent with the provisions of this clause and shall have the benefit of all and the same rights, immunities, exemptions, and limitations as provided for in Act 4 of the Hague rules or the corresponding provision of any Act that may be applicable, excepting subdivisions (1), (2) (j), (2) (q), (3) and (4) thereof. In no event shall the carrier be liable for any loss or damage to goods so carried on deck arising or resulting from any cause whatsoever, including unseaworthiness, unless affirmatively proved to be due to lack of due diligence or to the fault or the neglect of the carrier or those for whom it may otherwise be responsible, but the carrier shall not in any event be liable for any act, neglect or default

the words 'shipper' and 'carrier' as defined in the carrier's regular form of Bill of Lading. One signed Bill of Lading, duly endorsed, will be surren-

in the navigation or the management of the ship."

Universal delivered the original short form bill of lading, duly signed by its agent, but no copy of the long form bill was attached to or issued with it, though the short form stated where the regular form could be obtained. Neither the shipper nor its agent asked for one. The short form bill was issued *after* the delivery of the containers to Universal, and there was no opportunity for Britannica or United to inform Universal "in writing *before* the delivery of the goods to the carrier" that the containers should be stowed under deck. There was no evidence of any oral understanding or agreement by the parties regarding on deck stowage nor was there any evidence of notice by Universal to the appellant prior to the receiving of the containers on board that Universal had the option under Clause 13 to stow the containers above deck, nor was there any evidence that the appellant had any actual notice or knowledge that above deck stowage might be made. Moreover there was no proof that the appellant had ever had any past dealings with Universal although United had dealt with Orient Lines. There was no evidence that either Britannica or United had previously been issued a bill of lading containing Clause 13 nor does it appear when Universal adopted and began using that clause in its regular long form bill of lading. The goods were loaded and stowed on December 2, 1964 at 1300, and the ship departed the Port of New York at 2230 of the same day.

In the course of its winter crossing of the Pacific the Hong Kong Producer ran into what was described as "boisterous" weather. The abstract from the ship's log showed two days, January 11 and 12, 1965, when the wind velocity reached force 7–8 (28–40 knots) on the Beaufort scale and one day, January 13, when it

dered, if requested, to the agent of the vessel at port of discharge in exchange for delivery order."

reached 8–9 (34–47 knots), but it made no references to the condition of the sea nor any record of damage to the ship. The trial court found that "a considerable amount of sea-water passed over its weather decks on numerous occasions." The parties stipulated, and the court also found, that the shipment sustained some damage by breakage and sea water. The appellee's surveyors, on arrival at Yokohama, reported specific damage to two of the containers. The findings below state that over 1300 cartons had come in contact with sea water. Of these, 420 cartons containing volumes 1–12 of the encyclopedia and 236 cartons containing volumes 13–24, had sustained damage so extensive that the books were unmerchantable. The remaining volumes were only slightly damaged, and no claim has been made with regard to them. The two containers were also found to have been damaged.

The central issue of this case, as the trial court noted, is Britannica's claim that Universal issued to it what appeared to be a clean bill of lading which imported below deck stowage, and that Universal deviated therefrom by stowing six of the containers on deck. The district court held, in support of Universal's contention, that it did not issue a clean bill because Clause 13 of the bill of lading itself "specifically addresses itself to the question of ondeck stowage, stating that ' * * * it is agreed it is proper to and they [the goods] may be stowed on deck * * *.' " Under the terms of Clause 13 the carrier had the option to stow the containers above or below decks, unless the shipper notified it in writing, before delivery of the goods to the carrier, that under deck stowage was required. The district court concluded that the issue was a simple matter of contract; the shipper did not give written notice to the carrier that under deck stowage was required and, therefore, the carrier had the right to stow the goods on deck if it elected to do so.

We do not view this case as one of simple contract between completely free contracting parties. Universal is a common carrier and its legal relations may be affected by public interest. Congress has recognized this, with regard to shipment of cargoes out of the ports of this country in ocean going vessels, through enactment of The Harter Act, 46 U.S.C. § 190 et seq., and the Carriage of Goods By Sea Act (COGSA), 46 U.S.C. § 1301 et seq.

During the century or so preceding COGSA the laws governing liability for loss of or damage to ship-borne cargoes, which occurred in the course of their shipment overseas to foreign ports ran through wide swinging extremes from almost absolute responsibility of the carrier under the general maritime law to almost absolute immunity from such liability when the carriers, exercising their vastly superior bargaining powers, compelled shippers to submit to the insertion of innumerable, all embracing exceptions to liability in bills of lading which the carriers drafted. The courts of this country took steps to redress the balance by declaring some of these exceptions invalid. In some other countries, notably England, the courts upheld the exceptions. In 1893 by enacting The Harter Act, Congress sought to provide a statutory solution which would be fair to the competing interests. The Hague Rules, which leaned heavily on The Harter Act, were promulgated in 1921 and amended by the Brussels Convention in 1924, under the sponsorship of maritime nations and representatives of ocean shipping, to provide a set of uniform provisions for ocean bills of lading. This country joined the Brussels convention in 1936, and, to make its adherence effective, passed COGSA, which duplicates the Hague Rules practically word for word.

The purposes behind Harter, the Hague Rules and COGSA were to achieve a fair balancing of the interests of the carrier, on the one hand, and the shipper, on the other, and also to effectuate a standard and uniform set of provisions for ocean bills of lading. In Robert C. Herd & Co. v. Krawill Machinery Corp., 359 U.S. 297, 301, 79 S.Ct. 766, 769, 3

L.Ed.2d 820 (1959), the Supreme Court, speaking of the history of COGSA said:

"The legislative history of the Act shows that it was lifted almost bodily from the Hague Rules of 1921, as amended by the Brussels Convention of 1924, 51 Stat. 233.[5] The effort of those Rules was to establish uniform ocean bills of lading to govern the rights and liabilities of carriers and shippers *inter se* in international trade."

"5. The Hague Rules as amended by the Brussels Convention were, in turn, based in part upon the pioneering Harter Act of 1893, 27 Stat. 445, 46 U.S.C. §§ 190–196. See H.R.Rep. No. 2218, 74th Cong., 2d Sess. 7."

See Pan-Am Trade & Credit Corp. v. The Campfire, 156 F.2d 603 (2 Cir.), cert. denied 329 U.S. 774, 67 S.Ct. 194, 91 L.Ed. 666 (1946); Scarburgh v. Compania Sud-Americana de Vapores, 174 F.2d 423, 424 (2 Cir. 1946); Standard Electrica, S. A. v. Hamburg Sudamerikanische, etc., 375 F.2d 943 (2 Cir.), cert. denied 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967).

In anticipation of persistent efforts by carriers, who are the drafters of ocean bills of lading, to limit or eliminate their own duties and responsibilities under the Act by inserting into the foot long, double columns of well nigh indecipherable fine print, various exceptions to their possible liabilities, COGSA included a self-protective provision, § 1303(8), which prohibited the inclusion of clauses which relieve the carrier or ship from liability for loss or damage to goods arising from negligence, fault or failure in fulfilling obligations specified in other portions of the section or lessening such liabilities.[2]

2. 46 U.S.C. § 1303(8) provides:
"(8) Any clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods, arising from negligence, fault, or failure in the duties and obligations provided in this section, or lessening such liability otherwise than as provided in this chapter, shall be

This is not to say that the parties to a bill of lading are forbidden by COGSA to agree upon exceptions outside of the provisions of the Act. As stated in Gilmore & Black, Admiralty, § 3–25 at 125 (1957):

"Cogsa allows a freedom of contracting out of its terms, but only in the direction of *increasing* the shipowner's liabilities, and never in the direction of diminishing them." (Footnote omitted.)

See also COGSA § 1306, which is, however, not applicable to the present case.

In spite of the clear intent and purpose of COGSA, some carriers sought by various means to insert into their bills of lading provisions which would give them an added advantage or lessen their liabilities. These were not, however, necessarily arbitrary or lacking in equities. One provision known as the "Both-to-Blame Clause" was put in practically all ocean bills of lading after COGSA. It applied where there was a collision between two ships both of which were at fault and cargo was lost or damaged. If a recovery was made by the cargo against the non-carrying ship, the effect of the provision was to require that the amount recovered be paid over to the carrying vessel. This was considered an indemnification of the carrying ship for what it had to pay to the non-carrying ship by reason of the cargo damage, though COGSA had relieved the carrying ship of any liability for damage to its cargo because of negligent operation of the ship. The Supreme Court, however, struck down the clause as a violation of § 1303(8). United States v. Atlantic Mutual Ins. Co., 343 U.S. 236, 72 S.Ct. 666, 96 L.Ed. 907 (1952).[3]

null and void and of no effect. A benefit of insurance in favor of the carrier, or similar clause, shall be deemed to be a clause relieving the carrier from liability."

3. The decision affirmed the holding of this court in the case, before us sub nom. United States v. Farr Sugar Corp., 191 F.2d 370 (2d Cir. 1951). A portion of

Some carriers also sought to get around COGSA by providing in their bills of lading that only the law of a specified foreign country would apply and that any suit would have to be brought in the courts of that country. This court approved the provision in a bill of lading that Swedish law would apply and suits could be brought only in Swedish courts. Sweden applied the Hague Rules, and this undoubtedly was a persuasive factor in the decision, which also required that a clause of that kind be "not unreasonable in the setting of the particular case." William H. Muller & Co. v. Swedish American Line Ltd., 224 F.2d 806, 56 A.L.R.2d 295 (2 Cir.), cert. denied 350 U.S. 903, 76 S.Ct. 182, 100 L.Ed. 793 (1955). The holding did, however, give a certain amount of encouragement to the inclusion of such a clause in a bill of lading wherever the foreign country's law was less favorable than COGSA to shippers, but such a provision actually violated COGSA because it lessened the carrier's liabilities. See Gilmore & Black, Admiralty, § 3–25 at 125, note 23 (1957). Therefore, *Muller* was expressly overruled by Indussa Corporation v. S. S. Ranborg, 377 F.2d 200 (2 Cir. 1967), by the full court sitting in banc, on the ground that the holding in *Muller* violated the provisions of COGSA, particularly § 1303(8), as well as its intent and purpose.

Turning to Clause 13 of the bill of lading issued by Universal in the case now before us, we see a new and ingenious device which carries with it the strong likelihood of not only lessening the liabilities of the carrier but also stripping the shipper of all the protection afforded it by COGSA. This is doubtless the reason why the words " * * * so far as they may be applicable" were inserted following the Clause Paramount, required by 46 U.S.C. § 1312,[4] in the carrier's short form bill. In the first place Clause 13 places the burden of inquiry on the shipper, in circumstances in which it is highly unlikely that such an inquiry would be made, to search out a copy of the carrier's regular bill of lading to discover a clause which in effect authorizes a serious deviation from the standard provisions and which can only be prevented by the shipper's assuming the burden of giving notice to the carrier before delivery that below deck stowage is required. Even if the shipper, as in this case, never made any actual representation that the goods need not be stowed under deck, as Clause 13 says, never agreed that they might be stowed on deck and never had any notice or knowledge of the provisions of Clause 13, it would, nevertheless, by default lose the right to have its goods stowed below deck. Once the shipper has by default lost the right to under

---

the opinion is set forth at length in Gilmore & Black, Admiralty, § 3–39, note 106 at 155 (1957). It is repeated here because in its broader aspect it bears on the simple contract approach to the issue of the validity of Clause 13 in the case now before us. While there is no evidence that use of this clause is common or wide-spread in bills of lading, it would speedily be adopted, if it were held to be valid, because of the enormous advantage it gives the carriers. The quoted portion is 191 F.2d at 374 and reads as follows:
"The shipowners stress the consensual nature of the clause, arguing that a bill of lading is but a contract. But that is so at most in name only; the clause, as we are told, is now in practically all bills of lading issued by steamship companies doing business to

and from the United States. Obviously the individual shipper has no opportunity to repudiate the document agreed upon by the trade, even if he has actually examined it and all of its twenty-eight lengthy paragraphs, of which this clause is No. 9. This lack of equality of bargaining power has long been recognized in our law; and stipulations for unreasonable exemption of the carrier have not been allowed to stand."

4. The pertinent portion of § 1312 reads as follows:
" * * * every bill of lading or similar document of title which is evidence of a contract for the carriage of goods by sea from ports of the United States, in foreign trade, shall contain a statement that it shall have effect subject to the provisions of this chapter."

**14**

deck stowage, the concept behind Clause 13 assumes that the carrier is thereafter in a position to claim that the shipper has lost all its rights under COGSA because § 1301 by definition eliminates deck cargo from the provisions of the Act. Pannell v. United States Lines Co., 263 F.2d 497, 498 (2 Cir. 1959), cert. denied, 359 U.S. 1013, 79 S.Ct. 1151, 3 L.Ed.2d 1037 (1959); Globe Solvents Co. v. The California, 167 F.2d 859, 862 (3 Cir.), cert. denied, 335 U.S. 844, 69 S.Ct. 67, 93 L.Ed. 394 (1948); Blanchard Lumber Co. v. S. S. Anthony II, 259 F.Supp. 857, 864 (S.D.N.Y.1966). This leaves the carrier free to write into the bill of lading his own rules as to liability and burden of proof, just as Universal did in the third paragraph of the clause. The shipper, at this point a shorn lamb wholly untempered to the wind, has placed upon it "all risk of loss or damage by perils inherent in or to incidental [sic] such carriage" and the carrier retains for itself, not only all benefits inuring to it under the bill of lading, but to make it absolutely certain, incorporates all the rights, immunities, exemptions and limitations provided for in § 1304 of COGSA except for five provisions which would require the carrier to assume the burden of proof, as in (1), (2) (q) and (3) or where the carrier might be exposed to certain claims mentioned in the subsection, as in (2) (j) (see Gilmore & Black, Admiralty, § 3–34 at 143–144 (1957)), and (4). Clause 13 in its final sentence places the entire burden of proof of showing that loss or damage to cargo resulted from lack of due diligence or fault or neglect of the carrier on the shipper and goes on to reiterate the provision of § 1304(2) (a) that in no event will the carrier be liable

for any neglect or default in the navigation or the management of the ship. Thus, as the result of an unusual provision inserted by the carrier in its "regular" bill of lading, which it never specifically brought to the shipper's attention, and of which the shipper had no actual knowledge, the shipper was compelled to assume the risk of loss or damage resulting from above deck stowage of its goods, it lost its protection under COGSA, and was subjected to the burden of proof that loss or damage was due to the fault of the carrier, although evidence of such fault rests almost entirely in the hands of the carrier.

What adds to its unfairness is the context in which the ocean bill of lading functions. In accepting the short form, the shipper relies upon the fact that the long form, which is incorporated by reference, contains only the usual provisions which closely follow COGSA, unless there is some warning on the face of the short form of special terms or exceptions which differ from the COGSA provisions. If there is no definite agreement one way or the other, the shipper is entitled to expect below deck stowage.[5] It is impractical for a shipper to be compelled to make a detailed study of all of the fine print clauses of the carrier's regular bill on each occasion before it ships out a package. One of the principal purposes of COGSA was to obviate the necessity for doing so. At the time of its enactment the House Report, H.R. Rep. #2218, 74th Cong., 2d Sess. 7 (1936), said,

"The uniformity and simplification of bills of lading will be of immense value to shippers who will be relieved of the necessity of closely examining all bills

5. R. Colinvaux, Carver's Carriage of Goods by Sea 697 (11th ed. 1963). It is there stated that: "Goods ought not to be carried on deck if they are exposed to a greater risk than when stowed in the usual carrying part of the ship, unless the shipper has assented to their being so carried, or unless a custom to carry in that way exists in the particular trade." *Id.* at 697.

See also J. Ridley, Carriage of Goods by Land, Sea and Air 104 (2 ed. 1965), where it is stated that "the carrier is, however, only entitled to stow goods in those parts of the ship which are normally used for stowage. * * * The deck is not a part of the ship normally used for stowage."

of lading to determine the exceptions contained therein to ascertain their rights and responsibilities; to underwriters who insure the cargo and are met with the same difficulties; and to bankers who extend credit upon the bills of lading."

\* \* \* \* \* \*

"There are in existence hundreds of different forms of bills of lading with varying exceptions which will be eliminated by this legislation. This lack of uniformity creates an undesirable condition in business which will largely be corrected by this bill. On former occasions copies of bills of lading were presented to the committee. These bills contained exception clauses in print so fine they could only be read with great difficulty."

It is also interesting to note the remarks of Senator White made on the Senate floor during the debate on COGSA:

"The bill is designed to bring about uniformity in ocean bills of lading precisely as through the years uniformity in bills of lading has been worked out covering land transportation." 79 Cong.Rec. 8954 (1935).

There was nothing whatever on the face of the carrier's short bill of lading to indicate that the containers were deck cargo. The shipper properly assumed it was receiving a clean bill of lading, and the carrier also considered that the short form meant a clean bill.[6] This was not, as the trial court suggested, a case of confusion between broad and narrow meanings of "clean bill" as described in Givaudan Delawanna Inc. v. The Blijdendijk, 91 F.Supp. 663 (S.D.N.Y.1950). Rather a "clean bill" was understood by the parties as importing under deck stowage. It seems fairly clear that what happened was that the two containers were stowed, as understood, below deck

but that there was no hold space to take the remaining six and they were arbitrarily stowed on deck.

While the obvious theory back of Clause 13 assumes that the shipper's failure to give written notice requiring below deck stowage makes the goods deck cargo and thereby frees the carrier from all of the strictures placed in COGSA for the benefit of the shipper, so that the carrier can write the rules about liability and burden of proof, we conclude that as the bare wording of Clause 13 stands, the shipper, even though it gave no such written notice as Clause 13 calls for, nevertheless, did not lose its protections under COGSA because it literally does not come within COGSA's definition of the exception to "goods."

The terms of the agreement for the carriage of the containers of books were drafted and issued by the carrier and constituted a contract of adhesion. Consequently any special provisions, not uniformly standard in bills of lading and not required by COGSA, must be narrowly and strictly construed against the carrier. The rule of *contra proferentem* is discussed in 3 Corbin, Contracts § 559 (1960); among other things Professor Corbin said, at 269–270:

"The rule is hardly to be regarded as truly a rule of interpretation \* \* \*. It is chiefly a rule of public policy, generally favoring the underdog. \* \* It may well be that the rule is applied mainly in cases where the agreement contains an 'unconscionable' or at least an 'unreasonable' provision, and the court feels that the attention of the party whom it affects adversely was not clearly called to it."

The relevant part of § 1301(c) which defines goods says, "The term goods includes goods, wares [etc.] \* \* \* except \* \* \* cargo which by the contract of carriage is stated as being car-

---

**6.** The defendant carrier, in its memorandum in opposition to the plaintiff's motion for partial summary judgment in the district court said on page 2: " \* \* six of the containers were stowed on deck, whereas a clean bill of lading N.Y. JY–15

was issued covering the shipment." Also counsel for the carrier in his accompanying affidavit said, page 5, "admittedly the carriage of six metal containers were carried on deck and this was not noted in the bill of lading."

ried on deck and is so carried." The bill of lading (short form and long form combined) nowhere states that the cargo *is being carried on deck*. Clause 13 says it *may* be so carried but not that it *is* being so carried. No consignee or assignee could tell from the bill whether it was below deck or on deck cargo.

In St. Johns N. F. Corp. v. Companhia Geral, 263 U.S. 119, 44 S.Ct. 134, 68 L. Ed. 201 (1923), the carrier and shipper entered into a formal written and signed freight reservation agreement which expressly gave the carrier the option to stow on deck or below deck. The carrier issued a clean bill containing no reference to the freight agreement between the carrier and shipper and no statement that the goods were on deck cargo. The goods were jettisoned and lost in an emergency. The Supreme Court held that the issuance of the clean bill was, in effect, an exercise of the option in favor of below deck stowage, and because the cargo was stowed on deck, there was a deviation which made the carrier liable for the lost goods.

■ The *St. Johns* case is distinguishable from the present case in that there was in the former a separate written agreement for the option and no mention of it in the bill of lading, whereas in this case the option was in the regular form of the carrier. The carrier in *St. Johns* argued, in effect, that the option was exercised by the actual stowage on deck and the silence in the bill of lading didn't act as a promise to carry under deck. But the Supreme Court held it was the bill of lading that governed and determined how the cargo was to be stowed and that this was not affected by what the carrier did or by the terms of the separate freight agreement. In the present case the bill of lading stated the option, but it contained no information

or declaration whatever as to how it was exercised. As in the *St. Johns* case the option could not be left to be exercised by the actual placing of the cargo on deck or below deck. The bill of lading did not, therefore, qualify the goods within the exception to § 1301(c) as " * * * cargo which by the contract of carriage is stated as being carried on deck * * * "

■■ As the terms of the bill of lading do not bring the cargo within the exception, the containers were "goods" to which COGSA applied. Clause 13 states that the carrier will not be liable for any damage unless the shipper proves negligence or lack of due diligence on the carrier's part. This effects a shift in the burden of proof from the carrier, as provided by COGSA, to the shipper. COGSA had effected a change from the pre-Harter situation when the burden of proof was on the shipper, by shifting it to the carrier.[7] The burden of proof which COGSA has placed on the carrier is a major weapon in the shipper's arsenal.[8] It is almost impossible for the shipper to prove that the carrier was negligent or lacked due diligence because as a practical matter all evidence on those issues is in the carrier's hands. Clause 13's attempted transfer of burden of proof to the shipper creates such a lessening of the carrier's liability as to be impermissible under § 1303(8).

■■ Another reason why Clause 13 of the carrier's regular bill of lading cannot be invoked by Universal is because Universal is estopped from doing so. Certainly Universal, as the carrier, was chargeable with knowledge of Clause 13 in its own regular bill. In spite of this, it received delivery of the containers from United and put them on board *before* issuing the bill of lading. At that point in time it was impossible for

---

7. The burden is normally on the carrier either to prove that it exercised due diligence or that it was free from negligence in the preparation of the ship and care and stowage of the cargo. See §§ 4(1) and 4(2) (q) of COGSA, 46 U.S.C. §§ 1304(1) and 1304(2) (q).

8. The legislative history is quite emphatic on this point. See H.R.Rep. No. 2218, 74th Cong., 2d Sess. 8–9 (1936). The report stated, for example, that "this shift in the burden of proof [from the shipper to the carrier] will constitute a tremendous advantage to cargo owners." *Id.* at 9.

the shipper "to inform the carrier in writing before delivery of the goods to the carrier" that under deck stowage was required. By accepting the goods without notifying the shipper that it would be subject to an option in the carrier to stow the containers on deck, the carrier waived any right it may otherwise have had to exercise such an option. The trial court's idea that the shipper was chargeable prior to delivery of the goods to the carrier and the issuance of the bill of lading with the terms the bill of lading was going to contain is untenable. There was no evidence in the case of preliminary negotiations or oral representations by either party relative to anything contained in the carrier's bill of lading except for the names of the persons concerned, a description of the cargo and its destination which were furnished the carrier through a short form bill prepared by United and apparently handed over to the carrier with delivery of the containers. The trial court's finding that Britannica was, from experience, familiar with Universal's bill of lading, headed "Orient Overseas Line," and that its agent, United, was, or should have been, because it dealt with Orient Overseas Line, infers too much. There is nothing whatever to show that Universal ever issued to Britannica or United a bill of lading containing Clause 13 or anything like it nor, for that matter, was there any evidence that they had ever been issued a bill by any other carrier containing such a clause or anything like it.

From what little there is in the record it appears as if the parties proceeded on the assumption that the carrier had given the shipper a clean bill importing below deck stowage and that it was only because of a stowage problem that arose after issuance of the bill that the carrier found it necessary to stow part of the cargo on deck. The carrier itself so regarded its own bill of lading through-out the pretrial proceedings [9] and the entire presentation of evidence in the trial. It was not until the defendant carrier filed its post-trial brief that any mention of Clause 13 of its bill of lading was made. Either it was thrown in as a possible make-weight or the carrier itself had forgotten about the clause, lost as it was in the obscurity of the barely decipherable columns of print in which the bill's many provisions were contained.

At the trial below, the defense did not rest upon Clause 13 as authorizing stowage on deck but on custom of the port. When for the first time in its brief the carrier mentioned Clause 13 as a defense to breach of contract of carriage, the trial court made this the cornerstone of its decision and gave in a footnote only a brief glance in passing at the issue of a custom in the port of carrying goods in containers on deck, in the following words:

"Indeed, if a finding on this issue were required in this case, I would tend to the view that defendant, through its witnesses Rand and Sembler, established that in recent years there has been a growing practice of stowage of containerized cargo on weather decks of container ships and general cargo vessels."

 The parties have continued to contest the issue of custom on appeal and some comment is called for. The carrier argues that there is a custom in the shipping industry of carrying containerized cargo on deck, regardless of the provisions of the bill of lading. If there is such a custom, the bill of lading will be presumed to have been issued subject to it and the shipper may not claim liability on the part of the carrier for on deck stowage. See The Delaware, 81 U.S. [14 Wall.] 579, 605, 20 L.Ed. 779 (1871); [10] St. Johns Corp. v. Companhia Geral, *supra*.

9. See note 6, *ante*.

10. Of course if the bill of lading specifically stipulates that there shall be under deck stowage, a custom to the contrary would not override the stipulation, and on deck stowage in such circumstances would be an unjustified deviation.

The record in this case discloses that the carrier did not prove the existence of such a custom in the Port of New York. It produced two witnesses who testified on this point. The first, one Rand who was a representative of the Grace Line, stated that his company would stow any container on deck even if the shipper desired under deck stowage. Such testimony is certainly insufficient to show a custom of the port. A party cannot claim to have proved a valid custom merely by showing that it is the habit of some carriers to stow goods on deck contrary to the wishes or knowledge of shippers. The mere habit of a carrier to stow cargoes anywhere it chooses, even if it is in breach of its contract, cannot be said to establish a custom. See The Royal Exchange Shipping Co. v. W. S. Dixon & Co., 12 App.Cas. 11 (House of Lords 1886).

The gist of the testimony of the carrier's second witness, William Sembler, was that he knew it to be the practice of certain ships to carry containers on deck because they are "small ships designed for island trade." This testimony has no bearing on any custom of stowing containers on the decks of general ocean-going cargo vessels in international trade.[11] This witness also testified that he had seen containers on the decks of various ships in the New York harbor. But again, this is not evidence of a custom in the port. Incoming vessels from foreign ports would not show custom in the Port of New York. The fact that containers are at times carried on deck does not create a custom.

They could be on deck pursuant to contract or in violation of contract as well as pursuant to a custom.[12]

After examining all the testimony introduced on this point, we conclude that as a matter of law the carrier has presented no evidence which even tends to show that such a custom existed. The carrier is, therefore, not justified in claiming that the on deck stowage was permissible for that reason. We conclude that there was no custom in the port which justified Universal's stowage of the containers on deck nor can the carrier rely upon the authority of Clause 13 of its bill of lading for its action. In consequence the bill of lading must be treated as a clean bill importing below deck stowage. The stowing of the six containers on the weather deck was, therefore, an unreasonable deviation. It is not disputed that the damage to the cargo was caused by sea water to which it was exposed by being stowed on deck. The carrier is liable for the full amount of damages sustained without the benefit of the $500 limitation per package of COGSA. Jones v. The Flying Clipper, 116 F.Supp. 386 (S.D.N.Y.1953). The measure of damages is the fair market value at Yokohama, Japan, of the damaged sets in the condition they were in when shipped, less any salvage. St. Johns Corp. v. Companhia Geral, *supra* 263 U.S. at 125, 44 S.Ct. 134; The Ansaldo San Giorgio I v. Rheinstrom Brothers Co., 294 U.S. 494, 496, 55 S.Ct. 483, 79 L.Ed. 1016 (1935); R. T. Jones Lumber Co. v. Roen Steamship Co., 270 F.2d 456, 459 (2 Cir. 1959).

---

11. Sembler testified that cargo was stowed on deck in the island trade because the ship's own gear had to be used to unload cargo at many small island ports. He noted that in such a situation it was not practical to stow the containers under deck. He also testified that certain refrigerated containers were stowed on deck because there were no electrical outlets for the refrigeration units below deck. None of these considerations is pertinent to the stowage issue in the present case.

12. The defendant repeatedly made reference to the fact that so-called "container ships" carry containers on deck. This fact has no bearing on the propriety of on deck stowage in the present case. A container ship is specially outfitted safely to stow containers on deck. The Hong Kong Producer is a general cargo vessel and has no special rigging for the purpose. What may be an established custom for container ships is not proof of a custom in the port for general cargo vessels.

The judgment of the district court is reversed and the case is remanded for the determination of the issue of damages.

HAYS, Circuit Judge (dissenting):

### I.

It is unlikely that, except for the district judge, who in the course of his careful opinion never once mentioned COGSA, anyone will be more astonished at the majority opinion in this case than the appellant who in a forty-nine page brief addressed two pages to an almost *pro forma* argument on COGSA.

I suppose that nobody would deny that a carrier and a shipper can agree that cargo is to be stowed on deck. Not only has some cargo always been carried in this way, see Davidson v. Flood Bros., 30 F.2d 279 (9th Cir.), cert. denied, 279 U.S. 853, 49 S.Ct. 348, 73 L.Ed. 996 (1929); The Peter Helms, 24 F.Supp. 461 (W.D. Wash.1938); American Tobacco Co. v. The Katingo Hadjipatera, 81 F.Supp. 438 (S.D.N.Y.1948), modified, 194 F.2d 449 (2d Cir. 1951), cert. denied, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952); Givaudan Delawanna v. The Blijdendijk, 91 F.Supp. 663 (S.D.N.Y.1950), but the district judge in the present case said that if a finding were required he would "tend to the view that defendant * * * established that in recent years there has been a growing practice of stowage of containerized cargo on weather decks. * * * "

COGSA itself recognizes that the contract of carriage can properly provide that cargo is to be carried on deck (46 U.S.C. § 1301(c) (1964)).

The only issue in this case is the simple question of whether the shipper agreed that the carrier could, if it so chose, stow the cargo on deck.[1]

From the majority opinion one might gather that devilishly clever Chinese carriers were dealing with the unworldly professors who write the articles for the Encyclopaedia. In fact not only does the Encyclopaedia Brittanica, Inc. regularly ship books to all parts of the world, but in the present instance it hired an agent, the sole business of which consists of assembling and shipping cargo and which conducts this business everyday with many different shipping lines. Moreover, whatever the need for protection of small, individual shippers from being forced into "contracts of adhesion" by large carriers, one might well question whether carriers may seek to curry favor with shipping agents such as we have here who conduct a large business in assembling cargo from many shippers for carriage in containers.

The shipper was made aware of the existence of the regular bill of lading by the reference in the short form bill of lading which was delivered to it. It was the duty of the shipper's agent as an ordinary prudent businessman regularly engaged in the shipping business to examine the conditions under which the carrier accepted the cargo for shipment. If the shipping agent chose to ship the cargo without knowing anything whatever about the terms and conditions of the contract of carriage (as it now declares it did) it cannot now complain that that contract was not to its liking. Nor can the Encyclopaedia Brittanica, Inc. recover on the ground that its agent accepted a contract without knowing its terms.

The shipping agent was, of course, familiar with the almost universal practice of delivering the bill of lading after receipt of the goods.

"It is true that the bill of lading is generally not issued until after the

---

[1] The majority seeks to make much of a clause in the bill of lading which purports in certain cases to shift the burden of proof, claiming that the clause is ineffective by reason of contrary provision in COGSA. But, even assuming the majority is right as to the clause they question, the whole issue is totally irrelevant, since in the present case there is no issue of burden of proof. Surely the presence of a single clause that may be repugnant to COGSA does not serve to invalidate the entire bill of lading.

contract has been made; both parties, however, undoubtedly contemplate the issuance of a bill of lading, and the courts have found little difficulty in holding that the terms of the bill of lading constitute a part of. the contract." Poor, Charter Parties and Ocean Bills of Lading § 59, at 134–135 (5th. ed. 1968); see Luckenbach S. S. Co. v. American Mills Co., 24 F.2d 704 (5th Cir. 1928); Dietrich v. United States Shipping Board Emergency Fleet Corp., 9 F.2d 733, 740–741 (2d Cir. 1925), cert. denied, 278 U.S. 647, 49 S.Ct. 82, 73 L.Ed. 560 (1928).

If the agent had been interested in the terms of the contract, it could have requested a copy of the form in advance of delivery. If it was not interested the shipper cannot now complain of those terms.

### II.

In any event, the shipper's recovery should be limited to $500 per package pursuant to Section 4(5) of COGSA (46 U.S.C. § 1304(5) (1964)). Atlantic Mutual Insurance Co. v. Poseiden Schiffahrt G.m.b.H., 313 F.2d 872 (7th Cir.), cert. denied, 375 U.S. 819, 84 S.Ct. 56, 11 L. Ed.2d 53 (1963). By its express terms, that section applies "in any event."

Perhaps if the stowage of the cargo on deck had constituted a breach of the contract of carriage, its provisions would be inapplicable. But it seems highly unlikely that without including some more specific statutory direction the draftsman of COGSA intended that a breach of contract should relieve the carrier and the shipper of their rights and duties under the Act. The provisions of COGSA apply independently of any contract. See Benedict, 1 The Law of American Admiralty 291 n. 35 (Knauth ed. 1940). Indeed, it is generally accepted that COGSA modified the doctrine of deviation in maritime law at least to the extent that insurer's liability attaches only when the damage is causally related to the unreasonable deviation. See Searoad Shipping Co. v. E. I. du Pont de Ne-

mours and Co., Inc., 361 F.2d 833, 835–836 (5th Cir.), cert. denied, 385 U.S. 973, 87 S.Ct. 511, 17 L.Ed.2d 436 (1966); Gilmore and Black, The Law of Admiralty §§ 3–40 and 3–41 (1957). It is difficult to understand how the majority opinion can take the position that it is so important to protect an experienced shipper from losing the benefits of COGSA by agreeing to on deck stowage and yet can adopt the view that a breach of the contract of carriage nullifies the carefully balanced provisions of the Act.

Furthermore, it seems to me that each container as a unit is the package to which the $500 limitation should be applied. In Standard Electrica, S. A. v. Hamburg Sudamerikanische, Etc., 375 F.2d 943 (2d Cir.), cert. denied, 389 U.S. 831, 88 S.Ct. 97, 19 L.Ed.2d 89 (1967), this court held that the per package limitation applied to each of nine pallets, each containing six cardboard cartons of 40 television tuners and fastened with metal straps. In reaching this decision, the court relied on the characterizations of the parties, including document descriptions, the fact that it was the shipper who made up the cartons into a pallet for convenience and safety in handling, and the fact that the shipper had the option under section 4(5) to obtain full coverage by declaring the value of the goods and paying a higher tariff.

Here the containers were delivered to the carrier by the shipper's agent already packed with the individual carton of encyclopedias. On the bill of lading delivered to the agent by the carrier upon receipt of the containers, the "No. of Pkgs." and the "Description of Packages and Goods" were given as, e. g., "(1) One metal container No. UCC–5330 said to contain: 536 ctns. bound books." The shipper made no objection to this description. I would thus hold that the parties intended each individual container to be considered as the functional packing unit, that considering the containers as the packages promotes uniformity and predictability, and, accordingly, that the $500 per package limitation applies to the containers.