du PONT de NEMOURS INTERNATION-
AL S.A. and E. I. du Pont de Nemours
& Co., Inc., Plaintiffs,

v.

The S.S. MORMACVEGA, her engines,
boilers, etc., and Moore-McCormack
Lines, Inc., Defendants.

No. 68 Civ. 3102.

United States District Court,
S. D. New York.

Sept. 29, 1972.

See also D.C., 312 F.Supp. 322.

Hill, Rivkins, Warburton, McGowan & Carey, by Alan S. Loesberg, Martin B. Mulroy, New York City, for plaintiffs.

Hyde, Dickerson & Reilly, by John H. Reilly, Jr., New York City, for defendants.

## OPINION

BRIEANT, District Judge.

Plaintiffs du Pont de Nemours International S.A. and E. I. du Pont de Nemours & Co., Inc., Delaware corporations, have brought this action *in rem* against the S.S. MORMACVEGA, and *in personam* against her owner and operator, Moore-McCormack Lines, Inc., a Delaware corporation having its principal place of business in the City and State of New York. The action, tried before me without a jury on May 1 and 2, 1972, seeks to recover damages for cargo lost overboard at sea, one ocean shipping container containing 38 pallets of synthetic resin liquid.

Defendant was a common carrier of merchandise by water for hire. The synthetic resin liquid was the product known as "Teflon", and is not explosive, inflammable, nor otherwise dangerous.

The shipping container was delivered by a freight forwarder employed by E. I. du Pont de Nemours & Co., Inc. to Moore-McCormack's pier in New York City on April 28, 1967, consigned to du Pont de Nemours International S. A. In consideration of the agreed freight, Moore-McCormack agreed to carry the ocean shipping container, as a common carrier on the MORMACVEGA to Rotterdam, and issued its straight (or "clean") bill of lading, Exhibit 1.

The shipping container was stowed on deck at New York. It was lost at sea at about midnight on May 5/6, 1967. This cause is within the admiralty and maritime jurisdiction of this Court.

MORMACVEGA was built new in 1964 as one of a group of vessels (the "Constellation" class) intended for the transportation of general cargo. Such cargo was then loaded on what is described for convenience as a "break-

bulk" basis, that is to say, in such packages or crates, or on pallets as received from a consignor, or loose in cargo nets, and stowed by the stevedoring department of Moore-McCormack with such dunnage as circumstances required.

In 1966, MORMACVEGA was converted and reconstructed so as to be a combination break-bulk and container cargo vessel. Substantial structural changes were made, including the installation of a flume stabilization system to dampen the roll of the vessel, modification and strengthening of the hatches, and installation of support pedestals so as to permit ocean shipping containers to be stacked in tiers, three high, and so lashed and carried in safety. The pedestals consisted of twelve inch steel, with brackets at each tier level, cap plates, sockets and related gear, all specifically designed for the sole purpose of holding and carrying ocean shipping containers on deck. The conversion had the result of placing the vessel in the same structural situation as if she had been designed and constructed from the keel up, as a container ship.

After this conversion, which was accomplished at great expense, said to be in excess of $385,000.00, MORMACVEGA was duly surveyed in Baltimore on September 12, 1966. Her conversion for this combined usage, and open carriage of containers on deck was approved and the vessel recommended to be, and she was, retained in class. The extent and nature of the conversion is fully described in Exhibit A, and in the Spring of 1967, MORMACVEGA represented the best possible state of the art in the ocean transportation of shipping containers.

The theory or design of the conversion was that most of the containers would be carried on deck. Some containers, however, were to be carried in the hold. The number of containers stowed below deck on any particular voyage depended solely upon the quantity of break-bulk freight also being carried below, but approximately 35 containers could be stowed below deck. Ocean shipping containers as referred to herein, measure 40 feet in length, 8 feet in width and are 8 feet high, although in some locations, two "half-containers" with a total length of 40 feet were carried, instead of one. The total capacity of MORMACVEGA was 135 containers of 40 feet in length.

An unstructured procedure dictated by the practical necessities of the trade was followed in determining container stowage. In the first instance, as noted above, the amount of break-bulk merchandise being carried on a particular voyage determined the amount of cargo space left below deck for containers. If there were a large amount of break-bulk freight, few, or perhaps no containers would be carried below deck. The balance of the containers would be carried on the deck.

In determining the stowage of the vessel for a particular voyage, the stevedoring department of Moore-McCormack considered first, the amount of cargo space left below deck for containers after accommodating the break-bulk freight. To the extent possible, depending on the port at which the container was to be discharged and its time of arrival for loading, containers containing merchandise of great weight, containers holding items which had to be protected from freezing or atmospheric conditions, and containers available for loading early in the loading plan, which could be discharged after the deck containers had been removed, were stowed below deck. In 1967, no standard policy regulated the placement of containers, other than as herein set forth, except that containers holding explosive or inflammable material were generally loaded on deck, and containers to be discharged at the first port of call and containers which arrived late for loading, were usually placed on the deck. Presumably, to the extent possible in stacking containers on deck, the heavier containers were, in order to improve the vessel's stability, placed in the lowest of the three tiers.

Container shipping is a relatively new method. The practice of carrying con-

tainers of miscellaneous freight on merchant vessels began in 1956 in the carriage of containers entirely on deck, by Sea-Land in the Puerto Rican trade. These containers, in effect, were the bodies of trailer trucks and on arrival, wheels were fitted to them and they were transported as highway trailers. The vessels first used were tankships, carrying no cargo below decks.

In 1966, container shipping gained acceptance in the North Atlantic trade, and Moore-McCormack was one of the pioneers in this type of carriage from the port of New York. Those engaged in the North Atlantic trade in April, 1967, including defendant, carried all, or a portion of their load of containers on deck.

It was common practice to issue clean bills of lading where a container was stowed on deck. This practice had been followed in the Puerto Rican trade, and as a practical matter, shipping companies often issued the bill of lading (in lieu of a dock receipt) on arrival of the cargo at the pier, before the stevedore had established a complete plan of loading, and before it could be foretold with any certainty whether the particular container would be loaded on deck or below deck.

The contract of carriage affecting plaintiff's container is regulated by COGSA. Defendant offered no evidence to explain the cause of the loss. Defendant has abandoned the defenses raised in its answer based on due diligence used to make the vessel seaworthy, properly manned, equipped and supplied, etc., originally alleged to avoid all liability, pursuant to COGSA. Defendant also abandoned at the trial defenses previously asserted that the loss was occasioned by a peril of the sea in the nature of an unusually severe ocean swell, acting alone, or together with negligence of the Master in navigating on an unsafe course with respect to the ocean swell, or at an unsafe speed.

Accordingly, the plaintiff is entitled to judgment. The sole issue in the case is whether or not the carrier may limit its liability to $500.00 per package, pursuant to 46 U.S.C. § 1304(5), invoked by the bill of lading.

■ Paragraph 13 of the bill of lading, plaintiff's Exhibit 1, duly invoked the statutory $500.00 per package limitation. There is no question that in this Circuit, at least, plaintiff is entitled to recover not $500.00 for the single ocean shipping container, but rather $500.00 per package, multiplied by the number (38 pallets) of packages of the Teflon plastic in the ocean shipping container. Leather's Best v. S.S. MORMACLYNX, 451 F.2d 800 (2d Cir. 1971).

■ In the instant case, there is no real dispute as to the honesty of shipper's declaration that it had 38 packages within the container. In *Leather's Best, supra,* it appears that the container was loaded in the presence of, and a receipt given by, a truckman, who, the Court of Appeals considered (see footnote 2, p. 804 of 451 F.2d) was "acting on behalf of Mooremac". Stevedoring has always contemplated tally sheets and dock receipts maintained by or under supervision of the Master. If a shipper may now fill an ocean shipping container at some inland point, under circumstances where the carrier cannot tell if it contain 99 or 999 cartons of leather *(cf. Leather's Best, supra)* and recovery in the event of loss is to be determined by the unverified words "said to contain 38 packages", on the bill of lading, then severe practical difficulties will arise. Such is not, however, the circumstance of this case.

Plaintiff urges that the recovery should not be limited to $19,000.00, but rather that it should recover $109,000.00, representing the market value of the Teflon at point of destination. Plaintiff argues that defendant is not entitled to assert the limitation of liability contained in Title 46, U.S.C. § 1304(5) because of the traditional rule that carriage of cargo on deck where a clean bill of lading has been issued constitutes an unreasonable deviation from the contract of carriage, which is a breach and prevents reliance

on the limitation. Encyclopaedia Britannica Inc. v. S.S. Hong Kong Producer, 422 F.2d 7 (2d Cir. 1969) [hereinafter referred to as "Hong Kong Producer"].

Defendant urges that du Pont, a knowledgeable shipper, acting through a professional freight forwarder, was bound by the pertinent trade usages, including the custom of stowing containers on deck pursuant to *ad hoc* decisions made by the stevedore for the reasons set forth *supra*, p. 795. Defendant asserts that there is, or was in 1967, a custom in the shipping industry of carrying such containers on deck, and that a bill of lading, not claused for deck shipment, will be presumed to have been issued subject to the custom, and such stowage will not, therefore, be considered an unreasonable deviation.

I find that neither of the plaintiffs was actually aware of any custom or practice at the port of New York in 1967 under which carriers transported containers on deck pursuant to a clean bill of lading. Plaintiffs had been utilizing container service for about six months prior to the incident, and Traffic Manager DeLuca was able to see containers loaded on deck in vessels, including those of Moore-McCormack Lines, Inc., passing out of New York harbor and visible from the windows of his office, but he had no actual knowledge as to what the contents of the bill of lading for such other containers were, and DeLuca assumed (except with respect to hazardous cargo) that his containers were under deck when he had received bills of lading without any clause for on deck carriage. Moore-McCormack Lines, Inc. followed no uniform practice at the times complained of, concerning issuance of bills of lading with respect to the stowage of containers on deck. Some bills of lading were claused as to on deck stowage, and others issued clean, but still carried on deck.

The witness Felice testified that there was a standard practice of issuing clean bills of lading with respect to containers stowed on deck at the times complained of. He had direct experience with Grace Lines, and was familiar generally with trade customs with respect to the issuance of bills of lading. Such custom relied upon by Mr. Felice was local to New York harbor and of course limited to shipments originating in the port of New York, and bills of lading issued thereon.

Trade usages sanctioned by the passage of time, are presumed to be within the knowledge of parties regularly engaged in the business, in this case the shipment and carriage, respectively, of goods by sea. All contracts are presumed made with reference to trade usages and practice. U.C.C. § 1-205(2) and (5), McKinney's Consol.Laws, c. 38. Plaintiffs assert correctly, that a habit of sloppy practice, not attended by consequent damage followed by litigation, will not serve to show custom or usage contrary to well settled law. Farmers' and Mechanics' Bank v. Erie Ry. Co., 72 N.Y. 188 (1878). While du Pont's Traffic Manager, Mr. DeLuca, was not directly familiar with the custom and practice in selecting which containers would be carried below deck, there is no reason to believe that Schenkers International Forwarders, Inc., the freight forwarder selected for its expertise by du Pont and presumably engaged actively in assembling and consigning shipments of goods in New York harbor, was uninitiated as to these trade practices. No evidence on this subject was adduced by any party.

While du Pont did not have actual knowledge, it did have constructive knowledge, and also imputed knowledge through its agent, or freight forwarder, Schenkers. Defendant urges that this Court exonerate it because of such custom, as made applicable and binding by the Uniform Commercial Code in effect in New York with respect to the usages of the North Atlantic container trade, there being no explicit preemption in this area of the law by COGSA. But the custom is not sufficiently ancient to warrant reliance on constructive or imputed notice. The same claim, made on substantially the

same evidentiary basis, was rejected in this Circuit in the *Hong Kong Producer, supra,* at p. 18 of 422 F.2d. It is rejected here, on the same reasoning.

I also decline to find that there was any standard operating practice on the part of plaintiffs, or either of them, to advise defendant Moore-McCormack Lines, Inc. that their containers were to be stowed under deck, although such a standard procedure did exist immediately after this accident.

Plaintiffs contend that du Pont's operations manager (DeLuca) booked the container for the MORMACVEGA approximately April 24th by telephone conversation with one Drazen, an employee of defendant's container division. He stated that he advised Drazen that du Pont "wanted to book for under deck stowage." The parties stipulated that if Drazen were called as a witness he would testify that he did not recall the telephone conversation with Mr. DeLuca and that du Pont's shipments at the time in question were usually arranged through a professional freight forwarder, Schenkers Internationl Forwarders, Inc. of New York City. This latter contention is corroborated by Exhibit 1, which clearly shows that the bill of lading was issued through Schenkers as forwarding agent. It was further stipulated that Drazen would testify that it was defendant's policy at that time to make no commitment for under deck stowage, and that he adhered to this policy to the best of his recollection with respect to this shipment.

■ I decline to find on the evidence before me that any special oral contract existed with respect to this particular container requiring it to be stowed under deck, or that any such oral requests were then made generally with respect to du Pont's containers. In the absence of a showing of special factual conditions, such as perishability, not present here, the making of such an oral agreement might be an invidious discrimination in favor of du Pont, to the detriment of other shippers, which is precluded by statute. 46 U.S.C. § 815. The granting of such an undue or unreasonable preference would constitute a crime, (46 U.S.C. § 831) and, as an illegal bargain, would be unenforceable.

There remains then for determination solely the question of whether the carriage of this container on the deck of MORMACVEGA was an "unreasonable deviation" which constituted the proximate cause of damage and thereby prevents the carrier from taking the benefit of the limitation of liability provided for in COGSA, and the bill of lading.

■ The nature of the damage, and the failure of defendant to come forward with evidence which is entirely within the carrier's knowledge, justify our finding that the action of the sea or whatever caused loss of the container, would not have affected the container if stowed below deck. The containers below deck, and all but a very few of the containers on deck, were carried safely on this voyage. The claimed deviation was, therefore, the proximate cause of the damage.

■ But was the deviation in stowage unreasonable? *Hong Kong Producer, supra,* stands for authority that "if there is no definite agreement one way or the other, the shipper is entitled to expect below deck stowage." Such definite agreement could be supplied only by proof of custom and usage or a clause in the dock receipt or bill of lading not found here.

■ To the extent that *Hong Kong Producer* is read to state that a breach of such expectation as to stowage is an *unreasonable* deviation, such rule should not, in reason be applied to a ship specifically constructed or reconstructed to carry her cargo as does MORMACVEGA. The court there referred (fn. 5, p. 14 of 422 F.2d) to a passage from Carver's Carriage of Goods by Sea, at p. 697 (11th ed. 1963) stating the rule as follows:

"Goods ought not to be carried on deck if they are exposed to a greater risk than when stowed in the *usual carrying part of the ship,* unless the

shipper has assented to their being so carried, or unless a custom to carry in that way exists in the particular trade." (italics ours)

*Hong Kong Producer* also quotes Ridley, Carriage of Goods by Land, Sea and Air at p. 104 (2nd ed. 1965) as stating:

"The carrier is however only entitled to stow goods in *those parts of the ship which are normally used for stowage. . . . The deck is not a part of the ship normally used for stowage.*" (italics ours)

The aforesaid quotations from recognized text writers should serve to place the issue in its factual context. There is no relevant definition of "unreasonable deviation" in COGSA [see 46 U.S.C. 7 1304(4)]. "Congress recognized the doctrine of deviation as it had developed in maritime law but chose to make the carrier liable only for an unreasonable deviation." Atlantic Mutual Ins. Co. v. Poseiden Schiffahrt, 313 F.2d 872 (7th Cir. 1963), cert. den. 375 U.S. 819, 84 S. Ct. 56, 11 L.Ed.2d 53, see also Jones v. The Flying Clipper, 116 F.Supp. 386 (S.D.N.Y.1953).

To the same effect is St. Johns Corp. v. Companhia Geral, 263 U.S. 119, 124, 44 S.Ct. 30, 31, 68 L.Ed. 201 (1923) in which it was held:

"By stowing the goods on deck the vessel broke her contract, exposed them to greater risk than had been agreed and thereby directly caused the loss. She accordingly became liable as for a deviation, cannot escape by reason of the relieving clauses inserted in the bill of lading for her benefit, and must account for the value at distination."

Cases are found holding directly or by silence that carriage of cargo on deck is not an unreasonable deviation. Most of these relate to the particular trade, or kind of goods, often cognizable by custom. See, *e.g.* The Del Norte, 234 F. 667 (N.D.Cal.1916) [general merchandise stowed on deck by a coastal lumber steamer] and General Traffic Service Co. v. The Cape San Martin, 108 F.

Supp. 174 (S.D.N.Y.1952) [carriage of live elephants from Ceylon to U.S.].

Other authorities treating carriage on deck as a deviation, not unreasonable, relate not to the character of cargo, but to the intended usefulness or design of the deck on which the goods were stowed (cf. Carver and Ridley, op. cit. *supra*). The rule and its rationale are clearly stated in Colinvaux, Carver's Carriage by Sea, 12th ed. London 1971, vol. 2, p. 601 et seq. to be as follows:

"[G]oods placed in a deck-house must be regarded as loaded on deck, and not in the ordinary carrying part of the ship. But this appears to be a question of fact in each case; and *having regard to the manner in which steamers are now commonly built, it cannot perhaps be said that cargo must always be below the main deck in order to be in the ordinary loading space of the ship.*" (italics ours)

In his 12th edition of 1971, the editor qualifies the statement contained in the 11th (1963) edition, and quoted with approval in *Hong Kong Producer, supra,* at footnote 5, at p. 14 of 422 F.2d. He effects such qualification by footnote, reading as follows: (p. 602)

"Where the vessel belonged to one of a class constructed with the object of carrying the goods on deck, under cover of a hurricane deck, it was held in the U.S. that shippers must be deemed to have consented to their being so stowed: The Neptune (1867) 16 L.T. 36."

*The Neptune,* cited by Carver from an English report, is an appeal decided in 1868, in the Southern District of New York, which is also reported in 17 Fed. Cas. p. 1343, 6 Blatchf. 193 and 8 Int. Rev.Rec. 114. The claim was for damage to casks of oil which were stowed not in the hold, but between decks. The vessel encountered an "unusually violent storm." Circuit Judge Nelson wrote:

"As appears from the proofs, a large portion of the hold of such a propeller as this one was, is used for her engines, water, boilers, coal, &c., al-

though there is some space left for freight; but much the greater part of the freight is carried between decks, or on the main deck, as it is called. This deck is constructed specially for the purpose of carrying freight. It is bulwarked entirely around, and covered by the upper deck, and is as completely protected from the weather and from storms, as if it were the hold; and freight can be stowed in it as securely as in the hold. It may, perhaps, require more care in the stowage of casks, and of packages of that description, to prevent their rolling in stormy weather, than if they were in the hold, the tendency to disturb the cargo upon this deck being greater than when it is below. I concur, therefore, with the court below, that no fault is chargeable to the vessel, in stowing the oil in the between decks."

Here, MORMACVEGA belongs to a class of vessels "[re]constructed with the object of carrying the goods on deck" (Carver, op. cit., *supra*). The shipper delivered its cargo to MORMACVEGA specifically, and not merely to the carrier, and asserts it "booked space" on this particular vessel.

The case of a container ship, so constructed from the keel, or so reconstructed at great cost, as here, presents in our judgment, a situation in which carriage of containers on deck is not an *unreasonable* deviation, because the deck of a container ship is exactly where containers are reasonably intended to be carried.

Containers on the deck of MORMACVEGA were not necessarily subject to greater risks than those stowed under deck. As noted previously, *supra* pp. 794–795, MORMACVEGA had been specifically redesigned and rebuilt at a substantial cost so as to be the equivalent of a container ship designed and built new for the purpose of carrying containers in exactly the manner in which these were being carried. Inspection by Bureau of Shipping had indicated that the conversion was made in a workmanlike manner and that the design criteria for

conversion were satisfactory and effective to permit safe and reasonable use of MORMACVEGA and her sister ships for the purpose of carrying containers on deck, except with respect to possible damage from atmospheric conditions, freezing or dampness, not here present. These latter risks are not applicable to the inert plastic material shipped by plaintiffs.

To hold that an *unreasonable* deviation arises in every case, merely because containerized cargo is carried on the deck of a container ship, exactly in accordance with the method of carriage for which she was designed and built, flies in the face of the theory or reasons upon which deck carriage was originally considered a deviation, as outlined in Carver's 11th edition, and Ridley, cited *supra,* and relied on in *Hong Kong Producer, supra.*

I hold that, as a matter of law under the facts here present previously referred to, it was not an unreasonable deviation to carry container cargo such as inert plastic on the deck of a container ship, specifically built, designed and constructed with the intention of carrying in such manner. Just as it is not an unreasonable deviation to carry *specific goods* on deck which are usually carried on deck, it should not be considered an unreasonable deviation for a ship specifically designed to carry general cargo on deck to do so.

The prior decision reported at D.C., 312 F.Supp. 322 denying a motion made for summary judgment in this action is not considered determinative as to whether custom need also be established. The decision does not specifically so state. Application of the doctrine of "law of the case" to such a situation, is unwarranted. Dictograph Products Co. v. Sonotone Corp., 230 F.2d 131 (2d Cir. 1956).

Failure by the carrier to show a settled, well established port custom in 1967 to issue bills of lading not claused for on deck stowage is not material to the issue of unreasonable deviation. To

hold otherwise would mean that if a new, improbable, or even bizarre deviation in the stowage of goods should evolve overnight, at the instance of a firm not engaged in ocean carriage, reasonableness could never be asserted, no matter how advantageous, because, by reason of the novelty, no long established custom could be proved. In effect, that is just what happened with the advent, and surprisingly fast acceptance of containerization. Custom may evidence reasonableness, but it is not the only way to show reasonableness.

Plaintiffs jointly and severally shall have judgment against defendants in the amount of $19,000.00, together with interest since May 6, 1967.

The foregoing constitutes the findings of fact and conclusions of law of the Court pursuant to Rule 52, F.R.Civ.P.

Settle judgment on notice.