493 F.2d 97
 Du PONT de NEMOURS INTERNATIONAL S.A. and E. I. Du Pont de
Nemours & Co., Inc., Plaintiffs-Appellants,
v.
S. S. MORMACVEGA, her engines, boilers, etc., and
Moore-McCormack Lines, Inc., Defendants-Appellees.
 No. 11, Docket 73-1376.
 United States Court of Appeals, Second Circuit.
 Argued Oct. 1, 1973.
Decided Jan. 7, 1974.
 
 Alan S. Loesberg, New York City (Andrew R. Colmant, Thomas D. Toy, and Hill, Rivkins, McGowan & Carey, New York City, on the brief), for plaintiffs-appellants.
 John H. Reilly, Jr., New York City (W. Shelby Coates, Jr., and Hyde, Dickerson & Reilly, New York City, on the brief), for defendants-appellees.
 Before HAYS, FEINBERG and TIMBERS, Circuit Judges.
 TIMBERS, Circuit Judge:
 
 
 1
 Once again we have before us for construction the $500 per package limitation of liability clause of Moore-McCormack's ocean carrier bill of lading as authorized by COGSA. This time the issue presented-- apparently one of first impression-- is whether the stowage of a container on the deck of a modern containerized cargo vessel pursuant to a clean bill of lading, absent a contractual provision or a universal custom to the contrary, constitutes an 'unreasonable deviation' from the contract of carriage so as to deprive the carrier of its limitation of liability provided for in the bill of lading. The district court held that it did not. We agree. We affirm.
 
 I.
 
 2
 The action below, invoking the admiralty and maritime jurisdiction of the district court, was commenced July 30, 1968. It was brought by E. I. Du Pont de Nemours & Co., Inc. and Du Pont de Nemours International S.A. (Du Pont), the shipper and consignee, respectively. They sued Moore-McCormack Lines, Inc. (Mormac) and the S.S. Mormacvega. Mormac is the carrier that owned and operated the Mormacvega. Du Pont sought to recover $109,966.18 damages for the loss overboard at sea of an ocean shipping container of 38 pallets of a synthetic resin liquid known as 'Teflon'. After a bench trial at which Mormac in effect admitted liability but relied on the limitation of liability provision in its bill of lading, a judgment was entered on November 28, 1972 in the Southern District of New York, Charles L. Brieant, Jr., District Judge, awarding Du Pont.$19,000 plus interest from May 6, 1967. 367 F.Supp. 793. Du Pont now appeals from the judgment in its favor to the extent that it limited the shipper's recovery against the carrier to $500 per package pursuant to the limitation of liability clause in the bill of lading as authorized by Section 4(5) of the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. 1304(5) (1970).
 
 
 3
 The facts as found by the district court may be briefly summarized. In April 1967, Du Pont booked cargo for two 40 foot ocean shipping containers on the Mormacvega bound from New York to Rotterdam. The containers were delivered on April 28 by Du Pont's freight forwarding agent to Mormac's stevedoring department at a pier in New York. Mormac issued a clean bill of lading. The vessel sailed from New York for Europe on April 30. Unknown to Du Pont, the containers were stowed on the Mormacvega's deck in the area of her No. 5 hatch. At about midnight on May 5/6, 1967, one of the containers of 38 pallets of 'Teflon' was lost overboard at sea.
 
 
 4
 The Mormacvega was built in 1964 as one of the 'Constellation' class of vessels intended for the carriage of general cargo. Stowage was determined on what is commonly known as a 'breakbulk' basis, i.e. various units of freight were received from the shipper and stowed by Mormac with such dunnage as the situation warranted.
 
 
 5
 In 1966 the Mormacvega was reconstructed, refitted and converted into a combination 'break-bulk' and containerized cargo vessel. At that time containerized shipping, although still in an embryonic stage, was gaining acceptance in the North Atlantic trade.[1] Substantial structural changes were made in the Mormacvega to permit on deck stowage of ocean shipping containers. These modifications included installation of a flume tank stabilization system to dampen the vessel's roll, modification and strengthening of the hatches and installation on deck of support pedestals and related fittings which permitted stowage and lashing of containers three tiers high.[2]
 
 
 6
 As a result, the Mormacvega in effect was converted into a new vessel fitted in all material respects as if she originally had been designed and constructed as a combination cargo ship. Following her reconstruction, the Mormacvega was surveyed by the American Bureau of Shipping. Its inspection report indicated that the conversion was accomplished in a workmanlike manner and that it was effective for the safe carriage of ocean shipping containers on deck.
 
 
 7
 The Mormacvega was equipped to carry approximately 135 'forty foot equivalent' containers,[3] i.e. containers measuring 40 feet in length, 8 feet in height and 8 feet in width. The conversion contemplated that most of these would be stowed on deck. There was space in the hold, however, to accommodate the equivalent of approximately 35 containers.
 
 
 8
 To determine whether a particular container would be stowed on or below deck, a procedure dictated primarily by the practical necessities of the trade and to some extent by chance was used. If there was a large amount of break-bulk cargo, few if any containers would be stowed below. If the break-bulk cargo permitted container stowage in the hold, Mormac considered other factors in determining container placements. Whenever possible, depending on the port of call at which a given container was to be unloaded and the time of its delivery for onloading, heavier containers were stowed below to maintain optimum stability of the vessel. Containers with flammable or explosive materials generally were stowed on deck. Cargo which was likely to suffer from exposure to the elements was stowed below to the extent possible. Cargo which was delivered to the pier after the loading process had begun of necessity was stowed on deck.
 
 
 9
 In view of this procedure and the fact that cargo often was received at the pier before a complete stowage plan had been formulated or after initial placements made change impractical, it was impossible for Mormac to determine with any degree of certainty where a given container would be stowed. For this reason, it was Mormac's practice, and that of other carriers, to issue clean bills of lading to shippers even when it was possible or likely that a given container would be stowed on deck. This was so even when a shipper had made a specific request for below deck stowage.[4] It was therefore consistent with Mormac's established procedure for it to have issued a clean bill of lading with respect to Du Pont's consignment and to have stowed the containers on deck.[5]
 
 II.
 
 10
 The contract of carriage for Du Pont's shipment was subject to the provisions of COGSA.[6] Since Mormac at trial failed to explain the cargo loss and abandoned all defenses except its claimed limitation of liability, clearly it was liable for the loss.[7] The issue here, as it was in the district court, is whether, under the circumstances, the carrier may avail itself of the $500 per package limitation of liability provided in the bill of lading[8] and authorized by Section 4(5) of COGSA.[9]
 
 
 11
 It is Du Pont's position as the shipper that goods shipped pursuant to a clean bill of lading must be stowed below deck, absent a clear agreement to the contrary or a universal custom of the trade from which the consent of the shipper may reasonably be imputed. On deck stowage, Du Pont contends, necessarily constitutes an intentional and unreasonable deviation from the contract of carriage and precludes the carrier from relying on the statutory limitation of liability. Mormac as the carrier, on the other hand, maintains that on deck carriage of the containerized cargo aboard a vessel specially designed for that purpose, while it may have been a deviation, was not 'unreasonable' within the meaning of Section 4(4) of COGSA, 46 U.S.C. 1304(4) (1970), and therefore did not make it an insurer of the cargo loss.[10]
 
 
 12
 The concept of deviation was rooted in the law of marine insurance long before enactment of COGSA. A marine insurer was deemed to have assumed only those risks inherent in the contemplated voyage. As a result, whenever there was a voluntary and unexcused departure from the intended course, the contract of insurance was 'ousted' and the underwriters were totally discharged with respect to any loss occurring thereafter. See Hearne v. Marine Insurance Co., 87 U.S. (20 Wall.) 488 (1874); Oliver v. Maryland Insurance Co., 11 U.S. (7 Cranch) 487 (1813). A related consequence was an 'ouster' of the contract of carriage itself. The carrier thereby was precluded from relying on the contractual 'exceptions to liability' provided for in the bill of lading. The carrier thus became an insurer against any loss of or damage to the cargo thereafter. See, e.g., S.S. Willdomino v. Citro Chemical Co., 272 U.S. 718 (1927); Niles-Bement-Pond Co. v. Kampkiesa Kieselskabet Balto, 282 Fed. 235 (2 Cir. 1922).
 
 
 13
 While the concept of deviation originally applied to unjustifiable changes of route, American courts long have held that any carrier 'misconduct' which amounts to a material breach of the contract of carriage constitutes a 'deviation'. The consequences to the carrier were the same as in the case of a change of route. See, e.g., Propeller Niagara v. Cordes, 62 U.S. 7, 24 (1858). See generally Prosecution of the Voyage, 45 Tul.L.Rev. 807, 816 (1971); Gilmore & Black, The Law of Admiralty 3-40, 3-42, at 156, 159-60 (1957). Thus, unless warranted by agreement or universal custom, on deck carriage pursuant to a clean bill of lading was held to constitute a deviation sufficiently serious to oust the contract of carriage and to render the carrier an insurer of the cargo.
 
 
 14
 The traditional rule of deviation was stated in St. Johns Corp. v. Companhia Geral, 263 U.S. 119, 124 (1923):
 
 
 15
 '. . . the clean bill of lading amounted to a positive representation . . . that the goods would go under deck.
 
 
 16
 By stowing the goods on deck the vessel . . . exposed them to greater risk than had been agreed and thereby directly caused the loss. She accordingly became liable as for a deviation, cannot escape by reason of the relieving clauses inserted in the bill of lading for her benefit, and must account for the value at destination.'
 
 
 17
 See also Propeller Niagara v. Cordes, supra, 62 U.S. at 23; Encyclopaedia Brittanica v. S.S. Hong Kong Producer, 422 F.2d 7, 16-17 (2 Cir. 1969), cert. denied, 397 U.S. 964 (1970); Jones v. The Flying Clipper, 116 F.Supp. 386, 388 (S.D.N.Y.1953).
 
 
 18
 Whatever might have been the consequences of the deviation here under traditional maritime law, we are required to determine whether the deviation was reasonable within the meaning of Section 4(4) of COGSA, which provides in pertinent part that:
 
 
 19
 '. . . any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom . . ..' 46 U.S.C. 1304(4) (1970).
 
 
 20
 The Act provides no definition of 'reasonable deviation'; nor is there any indication in the Act of the appropriate legal consequences of a deviation if found. We mjst assume that Congress, in enacting the 'reasonable deviation' provision set forth above, was aware of the harsh doctrine which had rendered a deviating carrier an insurer of any subsequent causally related loss and chose to confine strict liability to situations where the deviation was unreasonable. See Atlantic Mutual Insurance Co. v. Poseidon Schiffahrt, 313 F.2d 872, 873-74 (7 Cir.), cert. denied, 375 U.S. 819 (1963).[11]
 
 
 21
 The district court appropriately made a factual inquiry as to the reasonableness of the deviation in the instant case. The court found that 'containers on the deck of the Mormacvega were not necessarily subject to greater risks than those stowed under deck'; that deck stowage was required by the realities and exigencies of Mormac's cargo terminal and ship loading procedures; that the vessel was specially reconstructed to permit safe carriage of cargo on deck; and that the stowage lashing and chocking of the cargo was approved shortly before departure by a surveyor from the National Cargo Bureau. Based on these and other facts, the court concluded that the deviation was reasonable.
 
 
 22
 Whether we view this determination as one of fact to which the 'unless clearly erroneous' standard of review applies, see, e.g., Surrendra (Overseas) Private Ltd. v. S.S. Hellenic Hero, 213 F.Supp. 97 (S.D.N.Y.), aff'd, 324 F.2d 955 (2 Cir. 1963), or as one of law, cf. In re Marine Sulphur Queen, 460 F.2d 89 (2 Cir.), cert. denied, 409 U.S. 982 (1972); Mamiye Bros. v. Barber Steamship Lines, Inc., 360 F.2d 774 (2 Cir.), cert. denied, 385 U.S. 835 (1966), we hold that the district court reached the correct conclusion.
 
 
 23
 Du Pont acknowledges that under some circumstances containers reasonably may be stowed on deck even pursuant to a clean bill of lading. It argues, however, that the court's finding with respect to the safety of on deck stowage was inconsistent with its finding that the loss would not have occurred had the Du Pont container been stowed in the ship's hold. We disagree. It does not follow logically that simply because on deck stowage was the cause of the loss, such stowage necessarily was more dangerous. Du Pont's argument would appear to prove too much. While we are hesitant even to attempt to equate the different kinds of risks associated with on deck and below deck stowage, it is evident that had the container been a shipmate with the breakbulk cargo below, it would have been subject to the dangers inherent in such proximity. For example, had the Du Pont container been stowed below and had it been damaged by a shift in the break-bulk cargo or by contamination from it, Du Pont might well have argued with force that its container should have been stowed on deck where it was meant to be carried and where it would not have been damaged. In any event, the record is barren of any evidence that on deck stowage was any more dangerous than below deck stowage.
 
 
 24
 We hold that the district court's findings are supported by substantial evidence and are not clearly erroneous.
 
 
 25
 We are not breaking new ground in recognizing that technological innovation and vessel design may justify stowage other than below deck. See, e.g., The Salvore, 60 F.2d 683, 685 (2 Cir.), cert. denied, 287 U.S. 653 (1932); Lagerloef Trading Co. v. United States, 43 F.2d 871, 872 (S.D.N.Y.1930); The William Crane, 50 Fed. 444 (D.Md.1889); The Neptune, 17 Fed.Cas. 1343, 1344 (No. 10,118) (C.C.S.D.N.Y.1868). Cf. Encyclopaedia Brittanica Inc. v. Hong Kong Producer, supra, 422 F.2d at 18 n. 12; Standard Electra S.A. v. Hamburg Sudamerikanischer, 375 F.2d 943, 945 (2 Cir.), cert. denied, 389 U.S. 831 (1967).
 
 
 26
 In all of these cases, the nature of the cargo or the construction of the ship was held to justify stowage other than below deck. They stand for the proposition that, while a clean bill of lading imports below deck stowage, nevertheless stowage elsewhere will be held to be an unreasonable deviation only when a ship's hold is the ordinary and contemplated stowage area. Leading authorities are in accord with this view. For example, Colinvaux states:
 
 
 27
 'Having regard to the manner in which steamers are now commonly built, it cannot perhaps be said that cargo must always be below the main deck in order to be in the ordinary loading space of the ship.' Colinvaux, Carver's Carriage of Goods By Sea 601 (12th ed.1971).
 
 
 28
 Here, the Mormacvega and her sister ships were reconsturcted, modified and refitted to permit the safe carriage of goods on deck. Thus the dangers historically associated with on deck stowage-- principally jettison, loss overboard and damage from ocean wash-- which support the cases upon which Du Pont relies were substantially reduced. We decline to hold, as Du Pont suggests, that an unreasonable deviation occurs every time goods are carried on deck-- even on a vessel specially designed for that purpose.
 
 
 29
 We hold under the circumstances of this case, and particularly in view of the special construction of the ship and the type of cargo involved, that on deck stowage of the Du Pont container was excusable, justifiable and therefore reasonable within the meaning of Section 4(4) of COGSA.
 
 
 30
 Affirmed.
 
 
 
 [1]
 The practice of carrying containers of miscellaneous freight on decks of merchant vessels began in the Puerto Recan trade in the mid-1950's. At the time of the loss here, Du Pont had been using Mormac's containerized service for approximately six months
 
 
 [2]
 This structural modification work was done at the Maryland Shipbuilding and Drydock Company at a cost in excess of $385,000
 
 
 [3]
 This term refers to the fact that two 20 foot 'half containers' could be coupled and stowed in the place of one full container. In addition, there were areas aboard the Mormacvega which could accommodate only half containers
 
 
 [4]
 The district court declined to find that there was an oral contract between the parties requiring that Du Pont's consignment be stowed below deck. We agree that the record would not support such a finding. We therefore do not reach the issue of whether such a contract, had it existed, would have constituted an unfair discrimination in violation of Section 14 of the Shipping Act of 1916, 46 U.S.C. 812 (Fourth) (a) (1970)
 
 
 [5]
 On occasion, Mormac did issue bills of lading specifically claused for on deck stowage. No explanation for these infrequent departures from the darrier's standard procedure appears in the record
 
 
 [6]
 Carriage of Goods by Sea Act, 46 U.S.C. 1300 et seq. (1970)
 COGSA provides that every bill of lading evidencing a contract for carriage of goods to or from ports of the United States in foreign trade shall be subject to the provisions of the Act. Id. at 1300.
 
 
 [7]
 An ocean carrier in the position of Mormac here ordinarily must prove, among other things, that it has exercised dur diligence with respect to the seaworthiness of the ship and that it was free feom negligence in the care and stowage of cargo. Sections 4(1) and 4(2)(q) of COGSA, 46 U.S.C. 1304(1) and (2)(q) (1970). These issues admittedly stand resolved against Mormac here
 
 
 [8]
 Section 13 of the bill of lading provides in relevant part:
 'In case of any loss or damage to or in connection with goods exceeding in actual value $500, . . . per package, . . . the value of the goods shall be deemed to be $500 per package . . . and the carrier's liability in any capacity, if any, shall be determined on a value of $500 per package . . . unless the nature of the goods and a valuation higher than $500 shall have been declared in writing by the shipper upon delivery to the carrier and inserted in this bill of lading and extrafreight freight paid if required . . ..'
 
 
 [9]
 In spite of the absolute terms of Section 4(5) of COGSA, 46 U.S.C. 1304(5) (1970)-- i.e. that
 'Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connedtion with the transportation of goods in an amount exceeding $500 per package . . ..'-- it is the law of this Circuit that any intentional, unjustifiable or unreasonable deviation from the contract of carriage will deprive the carrier of this statutory limitation of liability. See, e.g., Encyclopaedia Britannica v. S.S. Hong Kong Producer, 422 F.2d 7, 18 (2 Cir. 1969), cert. denied, 397 U.S. 964 (1970); Jones v. The Flying Clipper, 116 F.Supp. 386, 389-91 (S.D.N.Y.1953).
 Here the ocean bill of lading described the Du Pont consignment as '1 container said to contain 38 pallets resin synthetic liquid.' As the district court observed, there is no real dispute as to the accuracy of the shipper's declaration. We hold that the district court was correct in concluding that the 38 pallets constituted 38 packages for the purposes of 4(5) of COGSA. See Royal Typewriter Co., Div. Litton Bus. Systems, Inc. v. M/V Kulmerland, 483 F.2d 645, 648-49 (2 Cir. 1973); Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800, 814-16 (2 Cir. 1971).
 
 
 [10]
 In the district court, the parties introduced substantial evidence as to whether there existed a custom of the trade in the port of New York which authorized on deck stowage of containers aboard container vessels. They continue to press this issue on appeal. In view of the ground of our decision, it is unnecessary for us to reach this issue. We agree with Judge Brieant, however, that the evidence failed to establish the existence of any such custom in 1967
 
 
 [11]
 See also Gilmore & Black, The Law of Admiralty 3-41, at 159 (1957):
 'COGSA must clearly be taken to have abolished all legal effect of any deviation other than unreasonable.'