**ENGLISH ELECTRIC VALVE CO., LTD., Plaintiff,**

v.

**M/V HOEGH MALLARD, her tackle, engines, etc.; Westwood Shipping Lines; Alliance Skibs; and Lief Hoegh & Co., A/S, Defendants.**

No. 83 Civ. 0261 (MEL).

United States District Court, S.D. New York.

June 11, 1986.

Halley & Chalos, New York City, for plaintiff; Craig S. English, Peter Skoufalos, of counsel.

Dougherty, Ryan, Mahoney, Pellegrino, Giuffra & Zambito, New York City, for defendant Westwood Shipping Lines; Robert J. Giuffra, John J. Hession, Thomas L. Tisdale, of counsel.

LASKER, District Judge.

This admiralty case arises from water damage to an ocean shipment of electronic equipment from Oakland, California to Tilbury, England. The issues were presented to the court at a three-day non-jury trial following which the parties submitted pro-

posed findings of fact and conclusions of law. The court finds that the plaintiff has failed to sustain its burden of proof on its damage claims and that the defendant is entitled to judgment accordingly.[1]

## I.

Plaintiff English Electric Valve Co., Ltd. ("EEV") is a British company engaged in the manufacture of electronic tubes. EEV was the consignee of an ocean shipment of electronic equipment consisting of an A-type modulator for testing traveling wave tubes which it had contracted to provide to the British Ministry of Defense. EEV purchased the modulator in 1981 from the shipper, Aydin Energy Division ("Aydin") of Palo Alto, California, for an invoice price of $236,880.[2]

On November 18, 1981, Rainer Overseas ("Rainer"), freight forwarders acting on behalf of the shipper, Aydin, booked the modulator for shipment with Norton Lilly Co., Inc. ("Norton Lilly"), the agent representing Westwood Shipping Lines ("Westwood"), the defendant in this action. The cargo was booked for loading at Oakland, California aboard the vessel Hoegh Mallard (chartered at all relevant times by Westwood and owned by Alliance Skibs, A/S and Leif Hoegh & Co., A/S) and discharge at Tilbury, England. The booking note for the shipment indicates that the shipper's agent, Rainer, described the cargo as "electronic equipment," specified that it would be handled as an "H/H" (house-to-house) shipment, and requested a "flatrack" container as a "1st priority" and an "open top" container as a "2nd priority."[3] The parties agree that neither the shipper nor its representative ever specifically requested that the cargo be stowed below deck, and there is no evidence that any specific request for special handling was ever made.

A "flat rack" is a container with a floor, but usually no top or side walls, that is utilized for cargo which exceeds the dimensions of the container and can be secured to posts located at the corners. An "open top" is a container with a floor and side walls but no roof that is often used for cargo which is too tall for the container, or over-height.[4] However, open top containers are also employed with normal-size cargo, for reasons ranging from the type of loading facilities which are available to the kinds of containers the carrier happens to have on hand.[5] The top of an open top container is covered with a tarpaulin. At least when not containing over-height cargo, an open top is designed to be stowed on the deck of a vessel and to withstand the same spray and rain conditions as a metal or solid box container.[6] When an open top contains over-height cargo, there is some distortion in the tarpaulin cover,[7] and, of course, no other containers can be stacked on top of such an open top.

In a "house-to-house" shipment, the shipper bears the responsibility for picking up

1. This conclusion has been reached based upon a study of the court's contemporaneously made notes of the testimony at trial and a word-by-word reading of the trial record—which includes the deposition testimony of witnesses and numerous documents introduced into evidence by the parties.

2. Trial testimony of Norman Barker, EEV Secretary (hereafter "____ trial testimony"); Plaintiff's Exhibit 29 (hereafter "Pl.Ex. ____") (EEV letter of March 10, 1982 with enclosures). The invoice price did not include either the cost of EEV of the parts it supplied to Aydin for incorporation into the modulator or charges for shipping and handling.

3. Pl.Ex. 19 (booking note).

4. Defendant's Exhibit E at 9 (hereafter "Def.Ex. ____") (Deposition of John Polk, Norton Lilly operations manager) (hereafter "____ Dep."); Def.Ex. G at 12 (Deposition of John McMahon, Norton Lilly sales manager).

5. Trial testimony of Philip Lutes, Westwood operations manager; trial testimony of Chester Hopkins, plaintiff's expert on container operations; trial testimony of David Letteny, plaintiff's expert on intermodal operations.

6. Hopkins trial testimony; trial testimony of Philip Kimball, defendant's expert on naval engineering; Def.Ex. R at p. 2, § 3.2, and p. 25, § 8.16 (Requirements for Open Top Containers-American Society of Mechanical Engineers).

7. Hopkins trial testimony; Def.Ex. G at 10 (McMahon Dep.).

the container, packing or "stuffing" the cargo into the container, and delivering the container intact to the loading facility.[8]

Shortly before the modulator was shipped, Barry Jennis, the EEV manager in charge of the modulator project, witnessed successful tests of the equipment at Aydin in Palo Alto.[9] The modulator was then packed by Aydin or its representative in five wooden crates and stuffed into a standard open top container provided by Westwood. The largest crate contained the modulator cabinet and extended 14 to 14.5 inches above the top of the container, which was covered with a tarpaulin. The modulator cabinet was enclosed in an aluminum envelope, cushioned at its base by paper packing material, and surrounded inside and outside the envelope by bags of desiccant, a drying agent. The four smaller crates contained various components that had been removed from the modulator cabinet. The contents of the smaller crates were packed in paper and bubble wrap and interspersed with bags of desiccant, but not sealed in any sort of envelope.[10]

On December 1, 1981, the open top container in question was delivered to Westwood's stevedore at the pier in Oakland, who noted that the container was a "rag top" and "oversize" but indicated no damage.[11] The cargo was loaded aboard the Hoegh Mallard under the supervision of Westwood and Norton Lilly, and the bill of lading issued by Westwood, dated December 11, 1981, contained no exceptions to the condition of the cargo.[12] The Westwood bill of lading provided at Clause 20:

The goods, including goods shipped or carried in containers, vans, trailers or other unitizing devices, whether supplied by the carrier or shipper, *may be carried*

*on deck at carrier's option without notice to the shipper, consignee or owner of the goods, and, if carried on deck, the carrier shall not be required to specially note, mark or stamp any statement of on deck carriage on this bill of lading, any custom to the contrary notwithstanding.* The carriage of goods on deck shall be subject to the U.S. Carriage of Goods by Sea Act, 1936, notwithstanding Section 1(c) thereof.[13] [emphasis added]

Plaintiff's Exhibit 10 (bill of lading); Plaintiff's Exhibit 22 at 5 (large-print bill of lading clauses). Westwood also had a tariff on file with the Federal Maritime Commission which contained the following provision:

Rule 110 B. *Stowage of Containers*

Rates named in this tariff will apply on shipments tendered for transportation, provided that all freight received for transportation in or on containers, railroad cars, trailers or other vehicles is received "To be held and Transported on Deck." Shippers may not request deviation from this provision.

Defendant's Exhibit A at 33 (Westwood Pacific Coast-Europe Tariff No. 1). In addition, there is some evidence that Aydin's booking agent, Rainer, had previously booked similar cargo for Aydin (electronic equipment which was over-height and stored in an open top container) with Westwood or its predecessor shipping line, operating the same vessels in the same Pacific Coast-Northern Europe trade, and had been informed at that time that such cargo would have to be stowed on deck.[14]

The Hoegh Mallard is an open hatch container and break bulk carrier. The vessel is designed with container fittings to per-

---

**8.** Def.Ex. E at 6 (Polk Dep.); Def.Ex. G at 10 (McMahon Dep.); Lutes trial testimony.

**9.** Pl.Ex. 47 at 10–12 (Deposition of Barry Jennis, EEV Project Manager).

**10.** *Id.* at 61–63, 104–06, 121–22.

**11.** Def.Ex. H (Equipment Interchange Receipt & Safety Inspection Report); Lutes trial testimony.

**12.** Pl.Ex. 10 (bill of lading).

**13.** Section 1(c) of COGSA, 46 U.S.C. § 1301(c), excludes from the definition of goods "cargo which by the contract of carriage is stated as being carried on deck and is so carried."

**14.** Def.Ex. G at 9–10 (McMahon Dep.).

mit carriage of containers on deck and stowage of break bulk cargo below deck. Although the vessel lacks cell guides below deck with which fully containerized vessels are equipped, stowage of containers below deck is accomplished by locking containers to each other by the use of "twist locks" and "blocking and shoring" to reduce the shifting of cargo during a voyage. The Hoegh Mallard is equipped with two gantry cranes that are capable of lifting cargo to a height of two containers. Only the ship's gantry cranes (as contrasted with shore cranes) can be used to remove and replace hatch covers.[15] The eastbound service, *i.e.,* Pacific coast to Northern Europe, offered by Westwood generally permitted the stowage of containers on deck only, since the area below deck was usually filled with forest products such as lumber, pulp, and plywood loaded in the Pacific northwest. In the westbound service, the full range of the vessel was available for the stowage of containerized cargo.[16]

Prior to arriving in Oakland the Hoegh Mallard had loaded cargo at several ports in the Pacific northwest including Vancouver, British Columbia; Tacoma, Washington; and Coos Bay, Oregon.[17] Upon the vessel's arrival in Oakland, the area below deck was completely occupied by break bulk forest product cargo, with the exception of the under-deck stowage below hatch number 2 of ten standard containers which rested atop a number of tiers of break bulk cargo. There was a free space of 24 inches between the tops of the containers and the hatch cover.[18]

At the time the vessel took on cargo at Oakland, the stowage of a container under deck could only have been accomplished by replacing one of the ten containers stowed under deck at hatch 2. This would have required the removal of all containers then stowed atop hatch 2, as well as the removal of all containers stowed atop one of the adjacent hatches, in order to permit the temporary placement of the second hatch cover during the restowage of hatch 2.[19] When the Hoegh Mallard arrived in Oakland, there were twenty containers on deck at hatch 2, two containers at hatch 1, and between five and eight containers (the record is indeterminate) at hatch 3.[20]

The subject open top container was stowed toward the back of the forward third of the vessel atop hatch 4. It was placed in the third tier (the third and top container in its column, so to speak), in the third container position in from the port side of the vessel and seven containers from starboard. Containers were stowed three tiers high immediately to either side of the subject container, and containers stacked four high occupied positions fore and aft.[21]

The crew of the Hoegh Mallard conducted regular inspections of the cargo during the voyage to make sure it was properly secured.[22] On the night of December 18, 1981, off the coast of Mexico, the vessel encountered winds of force 6–7 on the Beaufort scale and wave heights of four to six meters, which the master described as the worst weather of the voyage.[23] The master's protest described the five-hour period of difficult conditions as "vessel rolling with water spray overall and washing up on deck." Plaintiff's Exhibit 5 (note of protest). A cargo inspection conducted the next day, on December 19, revealed damage in the form of dents up to 20 centimeters deep to the outer walls of three con-

---

15. Def.Ex. I at 10–11 (Deposition of Harald Fossem, Master of Hoegh Mallard); Lutes trial testimony.

16. Lutes trial testimony.

17. Pl.Ex. 25 (vessel position report).

18. Pl.Ex. 15 (final stowage plan).

19. Hopkins trial testimony; Lutes trial testimony; Def.Ex. I at 73–76 (Fossem Dep.).

20. Pl.Ex. 14 (container stowage plan); Hopkins trial testimony.

21. Pl.Ex. 15 (final stowage plan); Hopkins trial testimony; Lutes trial testimony.

22. Def.Ex. I at 20–22 (Fossem Dep.).

23. Def.Ex. I at 23, 28 (Fossem Dep.); Pl.Ex. 5 (note of protest).

tainers stowed on the lower tier, portside of hatches 3 and 4.[24]

At the vessel's first European port, Antwerp, Belgium, the open top container was restowed to a position two tiers high in order to permit off-loading by the ship's gantry cranes in the next port, Tilbury, England, where shore cranes were apparently not available.[25] On January 9, 1982, during the voyage between Antwerp and Tilbury, the vessel encountered Beaufort force 7 winds and sea spray on deck.[26] No notation was made at any time during the voyage about the tarpaulin covering the open top container having been ripped or dislodged, though the ship's master testified by deposition that such a development would have been noted during an inspection.[27]

The open top cargo was discharged in Tilbury on January 11, 1982. Westwood's Tilbury agent, Van Ommeren, Ltd. ("Van Ommeren"), subsequently reported in a telex communication to Westwood that the tarpaulin protection was found torn on discharge.[28] There is no evidence that any other damage to the open top container was noted upon discharge from the vessel. The open top container was off-loaded and handled on the pier by the West African Terminal of the Port of London Authority, a government agency acting as stevedore for Westwood.[29] Following discharge from the Hoegh Mallard, the container was stored in an open container park on the

quay to await customs clearance.[30] Although customs clearance normally takes two weeks, the container was kept in storage on the quay until February 3 at the request of EEV in order to await the return from overseas of EEV project manager Jennis.[31] Van Ommeren reported that the container was not dropped, struck, or otherwise damaged during discharge or movement upon the pier.[32] EEV's surveyer reported that during the period from January 10 until February 3 there were several occasions when there was heavy rain in Tilbury.[33]

At the request of EEV, Brantford International Ltd. ("Brantford"), its customs broker and freight forwarder, directed Van Ommeren to engage a trucker to transport the container to an EEV facility approximately 25 miles from the port of Tilbury.[34] The trucker, Edwin Freight Ltd. ("Edwin Freight"), delivered the container on February 3. The delivery note prepared by Edwin Freight contains no notation of any damage to the container when it was picked up at the port. However, upon delivery at EEV's premises, EEV manager Barry Jennis endorsed the delivery note: "Received damaged, by shipping company and sea water. To be assessed. BJ" Plaintiff's Exhibit 4 (Edwin Freight delivery note).[35]

According to EEV personnel Barry Jennis and David Cowell, who were present when the container was delivered, a sub-

**24.** Def.Ex. I at 22–24 (Fossem Dep.).

**25.** *Id.* at 57–59; Lutes trial testimony.

**26.** Pl.Ex. 5 (note of protest).

**27.** Def.Ex. I at 27, 76–77, 79 (Fossem Dep.).

**28.** Pl.Ex. 1 at p. 3 note (telex dated 9/9/83 from Van Ommeren to Westwood).

**29.** *Id.* at p. 3, ¶ H; Pl.Ex. 46 at 41 (Deposition of Stephen Burton, surveyor and adjuster for Brocklehurst Marine, EEV's adjuster).

**30.** Pl.Ex. 1 at p. 3, ¶¶ AB, D, L (telex dated 9/9/83 from Van Ommeren to Westwood); Pl.Ex. 46 at 43 (Burton Dep.); Pl.Ex. 48 at 19–21 (Deposition of David Cowell, EEV shipping manager).

**31.** Pl.Ex. 48 at 19, 22–23 (Cowell Dep.); Pl.Ex. 27 at 4 (survey report prepared for EEV).

**32.** Pl.Ex. 1 at p. 3, ¶¶ G, I (telex dated 9/9/83 from Van Ommeren to Westwood).

**33.** Def.Ex. P at Burton Exhibit B, p. 2 (internal Brocklehurst Marine memo from Stephen Burton to David Viner); Pl.Ex. 46 at 53 (Burton Dep.).

**34.** Pl.Ex. 48 at 6–7 (Cowell Dep.); Pl.Ex. 1 at p. 3, ¶ J (telex dated 9/9/83 from Van Ommeren to Westwood); Pl.Ex. 41 (Brantford duty and freight invoice to EEV); Pl.Ex. 47 at 41 (Jennis Dep.).

**35.** Pl.Ex. 47 at 17 (Jennis Dep.); Pl.Ex. 27 at 5 (survey report prepared for EEV).

stantial quantity of water flowed out when the door of the container was opened. They also noticed that the top of the over-height crate containing the modulator cabinet was broken along its length, and a piece of the plywood was pushed through the sealed aluminum envelope enclosing the cabinet.[36] When the crates were removed from the container and opened, it was discovered that the equipment had sustained substantial water damage, the packing material as well as the desiccant bags were wetted, and rust was evident on certain parts of the equipment.[37]

Two days later, on February 5, a surveyor from Brocklehurst Marine Surveyors and Adjusters ("Brocklehurst Marine") was hired by EEV to inspect the cargo.[38] The survey report issued on February 24 concluded that the damage to the equipment was the result of the ingress into the container of salt and fresh water. The report noted based on photographs and information provided by EEV that upon delivery to EEV both the container and tarpaulin cover were in sound condition.[39] According to the report, silver nitrate tests on the packing material in the four smaller crates as well as the packing material in the oversize crate on the outside of the aluminum envelope revealed that the water affecting it had salt content and was presumably seawater. Testing of the padding between the aluminum envelope and the modulator cabinet revealed no salt content. The equipment suffered to various degrees from corrosion, according to the report.[40]

An internal Brocklehurst Marine memo written by the employee-adjuster who performed the inspection indicates that there was no evidence of corrosion inside the modulator cabinet.[41] The memo also discusses the presence of freshwater wetting to the modulator cabinet:

> [I]t must be considered when fresh water could possibly have entered the box. This may well have happened after the container had arrived in the U.K. as it arrived at Tilbury on 10th January last. However, Mr. Jennis of English Electric Valve Co. was, at that time, out of the country and it was decided to delay final delivery until after his return. During the intervening period, there were several occasions when there was heavy rain and this rain water could easily have gained entry at this time. I think it unlikely that the tarpaulin covering the container was put into position until shortly before final delivery but I have no evidence in this respect.

Defendant's Exhibit P at Burton Exhibit B, p.2 (internal Brocklehurst Marine memo from Stephen Burton to David Viner).

EEV declared the shipment a total loss owing to the sensitive nature and precision requirements of the equipment, the extensive water damage and corrosion, and the estimate that the cost of testing and repairing the equipment would exceed its purchase price.[42] The salvage value received for the equipment was estimated at under $500.[43]

## II.

Because the cargo here was shipped in foreign trade (*i.e.*, transportation of goods between the United States and a foreign port) under a bill of lading, EEV's

---

**36.** Pl.Ex. 48 at 4 (Cowell Dep.); Pl.Ex. 47 at 16, 22 (Jennis Dep.).

**37.** Pl.Ex. 47 at 22–29 (Jennis Dep.); Pl.Ex. 28 (photographs); Pl.Ex. 27 (survey report prepared for EEV).

**38.** Pl.Ex. 47 at 26 (Jennis Dep.); Pl.Ex. 46 at 5 (Burton Dep.).

**39.** No evidence produced by the parties explains the presence of an undamaged tarpaulin covering at the time the open top container was delivered to EEV's premises. Because this fact is not the basis for any conclusions reached in this decision, speculation about the problem is unnecessary.

**40.** Pl.Ex. 27 (survey report prepared for EEV).

**41.** Def.Ex. P at Burton Exhibit B, p. 2 (internal Brocklehurst Marine memo from Stephen Burton to David Viner).

**42.** Pl.Ex. 47 at 23–26 (Jennis Dep.); Pl.Ex. 29 (EEV letter of March 10, 1982 with enclosures).

**43.** Barker trial testimony.

right to recover on its claim is governed by the provisions of the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. §§ 1300–15 (1982 & Supp.1983), see COGSA, 46 U.S.C. §§ 1300, 1312, and the bill of lading issued by Westwood itself incorporates COGSA in its first clause. Plaintiff's Exhibit 22 at 1 (large-print bill of lading clauses).

This case presents in essence two questions. First, has EEV made out a *prima facie* case that the goods were damaged while in the carrier's custody? Second, did the stowage of the cargo on deck constitute an unreasonable deviation from the contract of carriage which deprives Westwood of the $500-per-package limitation of liability contained in COGSA, 46 U.S.C. § 1304(5)? I conclude that the answer to both questions is in the negative.

[In Section II–A of the memorandum opinion, the court concluded that the plaintiff had failed to make out a *prima facie* case under COGSA.] *

B.

 Normally, it would be unnecessary to consider the question of the applicability of the COGSA $500-per-package limitation of liability in a case in which the plaintiff has failed to make out a *prima facie* case. However, since EEV would be entitled under the limitation provisions to maximum damages of only $2500 for the loss of the contents of the five crates of electronic equipment, as compared to its claimed actual damages of over $280,000, a finding that the limitation of liability provisions apply is tantamount to an alternative holding for the defendant in this case. In this regard I conclude that the on-deck stowage of the subject cargo by Westwood was not an unreasonable deviation and thus that even had the plaintiff proved its *prima facie* case it would have been entitled to only $2500 in damages.

COGSA provides in pertinent part:
Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.

46 U.S.C. § 1304(5). Westwood's bill of lading contains a similar liability limitation provision in Clause 13. Plaintiff's Exhibit 10 (bill of lading); Plaintiff's Exhibit 22 at 3 (large-print bill of lading clauses). However, a carrier may not rely on the statutory liability limitation if it has engaged in an unreasonable deviation from the contract of carriage. An unreasonable deviation constitutes a fundamental breach of the contract of carriage, entitling the shipper or cargo owner to treat the contract as abrogated, thereby eliminating the damage limitation in COGSA—which by its terms only applies to contract voyages. *See Iligan Integrated Steel Mills, Inc. v. S.S. John Weyerhaeuser*, 507 F.2d 68, 71–72 (2d Cir.1974), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1954, 44 L.Ed.2d 452 (1975).

1. *Deviation*

 Two kinds of deviations are recognized: the traditional geographic deviation, which occurs when a vessel departs from the customary course of the voyage, *see, e.g., General Electric Co. International Sales Division v. S.S. Nancy Lykes*, 706 F.2d 80 (2d Cir.), *cert. denied*, 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983), and the concept of "quasi-deviation," which is the on-deck stowage of cargo that the carrier had agreed to carry below deck, *see Iligan*, 507 F.2d at 72. The doctrine of quasi-deviation has, on occasion, been applied in other situations not relevant to the instant case, *see Agfa-Gevaert, Inc. v. S/S "TFL Adams"*, 596 F.Supp. 338, 342 (S.D. N.Y.1984) (citing examples); however, the

---

* Editors Note: At the Court's request, Section II–A of the memorandum opinion was omitted from publication.

**1456**

Court of Appeals for this circuit has stated that "the principle of 'quasi-deviation' is not one to be extended." *Iligan*, 507 F.2d at 72 (Friendly, J.); *accord Italia Di Navigazione S.p.A. v. M.V. Hermes I*, 724 F.2d 21, 22–23 (2d Cir.1983).

The idea underlying the principle of quasi-deviation is that in stowing on deck cargo which is required to be carried below a carrier has in effect embarked upon a different voyage from that contemplated and, as with a traditional geographic deviation, thereby exposed the cargo to unanticipated and additional risks. *See Jones v. The Flying Clipper*, 116 F.Supp. 386, 389 (S.D.N.Y.1953). In contrast, mere negligence in the stowage and handling of cargo is considered an ordinary risk of shipping and does not constitute a deviation which deprives the carrier of the liability limitation. *See id.; Nancy Lykes*, 706 F.2d at 87.

In determining whether cargo is required to be stowed below deck—a prerequisite to a finding that on-deck stowage constitutes a quasi-deviation—the rule is that "absent an agreement or an established custom from which consent of the shipper for on-deck stowage may be imputed, a clean bill of lading imports stowage below deck." *Seguros Banvenez, S.A. v. S/S Oliver Drescher*, 761 F.2d 855, 859 (2d Cir.1985).

In this case Westwood issued a clean bill of lading. Westwood contends, however, that on-deck stowage of the cargo does not constitute a deviation because: (1) the shipper's agent had actual knowledge the container would be carried on deck; (2) the shipper never requested under-deck stowage or special handling of the cargo; (3) the bill of lading gave Westwood the option of stowing cargo on deck; (4) Westwood's tariff put the shipper on notice that the normal rates charged by the carrier were for on-deck stowage; and (5) the custom and practice of the industry is to carry open-top containers on deck. EEV re-

sponds that (1) the request by the shipper's agent for a flat rack or open top container and the specification that the cargo consisted of electronic equipment was tantamount to a request for under-deck stowage; (2) the presence of an option clause in the bill of lading is insufficient, as a matter of law, to deprive the shipper of the expectation that the goods would be stowed below deck in the absence of any agreement as to how the option would be exercised; (3) Westwood's tariff gives constructive notice to a shipper only of those of its terms that are required by law to be filed; (4) since Westwood's tariff is inconsistent with its bill of lading, the bill of lading—by its own terms —controls; and (5) the custom and practice in the steamship industry is to stow below deck over-height, sensitive cargo which is packed in open top containers.

### Actual Notice

As to the understanding between the shipper or its agent and Westwood, there is uncontradicted evidence in the record that Rainer (Aydin's booking agent) had previously arranged with Westwood or its predecessor shipping line for the shipment of similar Aydin cargo (electronic equipment in an over-height, open top container) on the same type of vessel as the Hoegh Mallard and had been informed that such cargo would have to be stowed on deck. It was the deposition testimony of John McMahon, Norton Lilly's sales manager, that he actually dealt with the same individual at Rainer on both occasions. Although this prior practice, standing alone, would in my view be insufficient to establish an agreement between shipper and carrier to stow the cargo on deck, I believe it is relevant to the issue of what the shipper could reasonably expect absent an express agreement.

### Request by Shipper for Under-deck Stowage

With regard to the shipper's request for a flat rack or open top container and the

description of the cargo as electronic equipment, I conclude that such specifications were not the equivalent of a request for under-deck stowage. The testimony of the parties' witnesses was in direct conflict on this point. Chester Hopkins, plaintiff's expert on container operations, testified that either electronic equipment stowed in an open top container or any type of over-height cargo would merit classification as a "hot load" requiring under-deck stowage.[57] David Letteney, plaintiff's intermodal operations expert, agreed with Hopkins that either over-size or sensitive cargo should be stowed below deck, but admitted that a request for a flat rack or open top container would not necessarily mean the cargo was over-height and stated on cross-examination that the normal practice was for a shipper to notify the carrier if it wanted sensitive cargo stowed below deck.[58]

Philip Lutes, Westwood's operations manager, testified that in his experience "hot cargo" was cargo that had to be unloaded quickly, that electronic cargo would not get special handling in a house-to-house situation—where the shipper is responsible for packing, and that although the main purpose of flat rack and open top containers was to accommodate over-height cargo, an assumption that the cargo was over-height based only on the booking would not be warranted since flat racks and open tops were used for other reasons as well. Lutes admitted that if Westwood had received what it knew to be an over-height container of sensitive cargo it would investigate whether it was possible to stow it below deck, but pointed out that it was only upon measurement of the container by the terminal operator at Oakland that Westwood knew the shipment was over-size, and at that point in the process it is only the type of container (e.g., flat rack, open top), and not its contents, that the stevedores are informed about.[59] George Armstrong, Westwood's packaging expert, testified that it was possible to pack electronic equipment with "stretch wrap" in such a way as to protect the cargo regardless of where it is stowed on the vessel.[60]

In light of all the testimony, it is not reasonable to charge Westwood's agent with knowledge that this booking was a request for under-deck stowage, and it is not disputed that the shipper made no request for special handling.

### Bill of Lading Option Clause

[7] Clause 20 of Westwood's bill of lading gives the carrier the option to carry on deck goods shipped in containers without notice to the shipper, consignee or owner of the goods and without noting "on deck carriage" on the bill of lading. EEV, relying on *Encyclopedia Britannica, Inc. v. SS Hong Kong Producer*, 422 F.2d 7 (2d Cir.1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970), argues that since the bill of lading contained no information as to how the option would be exercised, Clause 20 does not alter the shipper's expectation that goods shipped under a clean bill are required to be carried on deck. *Hong Kong Producer* involved several containers of encyclopedias shipped under a short form bill of lading which contained no notice or statement that the cargo was to be carried on deck. The regular form bill of lading, which was incorporated by reference in the short form, contained a clause which not only granted the carrier an option to carry cargo on deck but also placed upon the shipper both the risk of loss for damage incidental to on-deck stowage and the burden of proof as to the carrier's negligence. *Id.* at 9–10. The court in *Hong Kong Producer* found that the short form bill of lading was a contract of adhesion, that the shipper had no actual

---

**57.** Hopkins trial testimony.

**58.** Letteny trial testimony.

**59.** Lutes trial testimony.

**60.** Trial testimony of George W. Armstrong, Westwood's packaging expert.

notice of the carrier's option, that the insertion of the option clause and accompanying provisions impermissibly shifted the risk of loss and burden of proof from carrier to shipper in derogation of COGSA, and that no relevent custom could be proved with respect to the carriage of containers on the deck of a container ship since the vessel involved was a general cargo vessel with no special container rigging. *Id.* at 10–19.

*Hong Kong Producer* is distinguishable from the instant case. First, there is no argument made or to be made in this case that the bill of lading provision containing the option to stow containerized cargo on deck constitutes a contract of adhesion. Second, there is evidence, discussed above, that the shipper's booking agent here had actual notice that the cargo might be stowed on deck as a result of its past dealings with Westwood in a virtually identical situation involving Aydin cargo. Third, the relevant clause in Westwood's bill of lading does not shift either the risk of loss or the burden of proof as to the carrier's negligence to the shipper. The *Hong Kong Producer* court was particularly concerned that by stowing the cargo on deck the carrier in that case had excluded such cargo from COGSA coverage—thereby allowing the carrier to rewrite the rules on risk of loss and burden of proof—because COGSA by its terms excludes from the definition of *goods* "cargo which by the contract of carriage is stated as being carried on deck and is so carried," 46 U.S.C. § 1301(c). *Id.* at 13–14. In the present case, however, Westwood's bill of lading provides in its introductory paragraph that the "terms 'goods' and 'cargo' are used ... interchangeably [to] include goods carried on deck," and Clause 20 itself provides that "[t]he carriage of goods on deck shall be subject to the U.S. Carriage of Goods By Sea Act, 1936, notwithstanding Section 1(c) [46 U.S.C. § 1301(c)] thereof." Plaintiff's Exhibit 22 at 1, 5 (large-print bill of lading clauses). Accordingly, the options clause in Westwood's bill of lading is not a provision which either limits or relieves a carrier's liability in derogation of COGSA. *Cf. Hanover Insurance Co. v. Shulman Transport Enterprises*, 581 F.2d 268 (1st Cir.1978) (invalidating $50-per-shipment liability limitation clause). Fourth, the vessel involved in *Hong Kong Producer* was a "general cargo vessel" with "no special rigging" for carrying containers on deck, as opposed to a "container ship ... specially outfitted safely to stow containers on deck." 422 F.2d at 13 n.12. For this reason the *Hong Kong Producer* court considered established custom for container ships irrelevant to the facts presented in that case. In this case, however, it is not disputed that the Hoegh Mallard was specially designed to carry containers on deck and thus that Westwood's practice of stowing containers on deck derived from more than the "mere habit of a carrier to stow cargoes anywhere it chooses," *id.* at 18. Particularly relevant to the latter point is the evidence in the record that Westwood had a consistent practice in its eastbound service of stowing containers almost exclusively on deck so that break-bulk cargo could be accommodated below.

Accordingly, I conclude that the option clause in the Westwood bill of lading evidenced a sufficient contractual agreement from which consent by the shipper to on-deck stowage can be inferred. Because I find that *Hong Kong Producer* does not control the instant case, I decline to follow the decision in *Lime International Corp. v. Alpha North America Line, Ltd.*, 1979 AMC 2693 (S.D.N.Y.1979), and, to the extent it bears on this issue, the decision in *Ingersoll Milling Machine Co. v. M/V Bodena*, 619 F.Supp. 493, 500 (S.D.N.Y. 1985)—both of which rely on the holding in *Hong Kong Producer*. I also note that at least one post-*Producer* decision by the Court of Appeals has held that it was not a deviation for a container ship to stow a container on deck under a clean bill of lading from which the words "Stow under deck only" (inserted by the shipper's freight forwarder) had been deleted by the carrier and which was otherwise silent as

to the manner of stowage. *See Rosen-bruch v. American Export Isbrandtsen Lines,* 543 F.2d 967, 971 (2d Cir.), *cert. denied,* 429 U.S. 939, 97 S.Ct. 353, 50 L.Ed.2d 308 (1976).

### Westwood's Tariff

 The question of whether Westwood's tariff placed the shipper on notice that the cargo would be carried on deck is of less importance in view of the conclusion above regarding the option clause. The tariff provision in question, Rule 110 B, informed the public that the rates named in the tariff would apply to all freight, provided that all freight received for transportation in containers was "To be held and Transported on Deck." Defendant's Exhibit A at 33 (Westwood Pacific Coast-Europe Tariff No. 1). The law is that the filing of a tariff gives constructive notice only of those terms in the tariff which are required by law to be filed. *Port of Tacoma v. S.S. Duval,* 364 F.2d 615, 617 (9th Cir.1966); *Moonwalk International, Inc. v. S.S. Seatrain Italy,* 1985 AMC 1270, 1276–77 (S.D.N.Y.1984). The regulations promulgated pursuant to the statutory tariff filing requirements contained in the Shipping Act of 1916, 46 U.S.C. § 817 (1982), define a tariff as:

> A publication containing the actual rates, charges, classifications, rules, regulations, and practices of a carrier or conference of carriers for transportation by water. For the purposes of this part, the term "practice" refers to those usages, customs, or modes of operation which in any wise affect, determine or change the transportation rates, charges or services provided by a carrier....

46 C.F.R. § 536.2(n) (1982). The specification in the tariff of on-deck stowage of containerized cargo would seem to be a "practice," as that term is defined in the regulations. According to the deposition testimony of the Norton Lilly operations manager, a cargo booking accompanied by a special request for under-deck stowage would require the calculation of a special rate by the pricing department.[61] Consequently, the manner of stowage would constitute a mode of operation which would change the transportation rate offered by the carrier. I therefore conclude that the shipper in this case had constructive notice of the tariff provision regarding on-deck stowage of containerized cargo.

As to EEV's contention that the tariff provision is inconsistent with the bill of lading and therefore of no effect under the terms of the bill, I cannot agree. Clause 30 of the bill of lading provides: "In the case of any inconsistency between this bill of lading and the applicable tariff, this bill of lading shall prevail." Plaintiff's Exhibit 22 at 6 (large-print bill of lading clauses). The tariff provision in question notifies the public that rates for containerized cargo presume on-deck stowage and goes on to state: "Shippers may not request deviation from this provision." Defendant's Exhibit A at 33 (Westwood Pacific Coast-Europe Tariff No. 1). Although this "no deviation" provision may appear on its face inconsistent with the bill of lading "carrier's option" provision, I think an equally fair interpretation is that the tariff provision means a shipper can only receive the published rate for containerized cargo if it is carried on deck. This construction is reasonable in light of Westwood's stated practice of researching and quoting a special price when presented with requests for under-deck stowage. Therefore, no conflict exists between the tariff and the bill of lading.

### Custom

 Finally, I conclude that the custom and practice in the steamship industry is to carry open top containers on deck on vessels designed to carry containers on deck. The proposition that open top containers are customarily carried on deck was not the

---

61. Def. Ex. E at 8, 29 (Polk Dep.).

**1460**

subject of dispute at trial, as witnesses for both the plaintiff and defendant were in agreement on this point.[62] Evidence was also introduced showing that the cover photograph on a recent issue of the trade magazine, *Pacific Shipper*, depicted open top containers stowed three high on the deck of a vessel.[63] And there was uncontradicted evidence that open top containers not containing over-height cargo are designed to withstand the rigors of an on-deck voyage as effectively as standard containers. Moreover, the cases in this area have recognized that the advent of containerization has changed the notion of what method of stowage a shipper has a right to expect when it arranges for the carriage of containerized goods under a clean bill of lading. *See, e.g., Du Pont de Nemours International S.A. v. S.S. Mormacvega,* 493 F.2d 97, 102 (2d Cir.1974) ("We are not breaking new ground in recognizing that technological innovation and vessel design may justify stowage other than below deck."); *O'Connell Machinery v. M.V. Americana,* No. 82–6341, transcript at 574–76 (S.D.N.Y. Oct. 18, 1984) (Judge Knapp found that it was the custom and practice in the Port of Genoa to stow flat rack containers on deck) (adopted as final decision by Order of Jan. 14, 1985); *Poliskie Line Oceaniczne v. Hooker Chemical Corp.,* 499 F.Supp. 94, 100 (S.D.N.Y.1980) ("It is not generally unreasonable to stow a container on the deck of a vessel equipped for such stowage.")

EEV contends that the relevant custom is that pertaining to the proper stowage of over-height containers holding sensitive cargo—not merely open top containers— and that the on-deck stowage of such cargo is contrary to industry practice. Even if it were shown that the custom and practice in the industry is to stow over-height, open top containers holding sensitive cargo below deck, however, EEV would still fail to establish that there was a quasi-deviation

in this case. This is so because it would seem that once a carrier establishes a general custom as to on-deck stowage that precludes the traditional inference from a clean bill of lading that under-deck stowage is required—as Westwood has done here— proof by the shipper showing that the carrier failed to follow customary trade practices in stowing its particular cargo—here sensitive goods in an over-height container—can at most be evidence of negligence in stowing the cargo. Put another way, it would seem that a carrier's failure to conform to a stowage custom will not support a finding of deviation once the carrier has succeeded in overriding the traditional expectation that all cargo should be stowed on deck. Mere negligence in the stowage and handling of cargo is considered any ordinary risk of shipping and does not constitute a deviation which subjects the carrier to insurer's liability for damage to the goods.

I find in the alternative that no custom and practice in the industry as to the stowage under deck of over-height containers of sensitive cargo was proved at trial, while the custom of stowing containerized cargo on the deck of properly fitted vessels was not contested. The evidence showed at most that the kind of cargo involved here might be carried above or below deck depending on the manner of its packaging, the nature of the ship, and logistical factors including what other cargo had been booked, the stowage space available, and the schedule for loading and off-loading.

In summary, I hold that there was an agreement from which to infer the shipper's consent to on-deck stowage of the cargo. Alternatively, I hold that the custom and practice in the steamship industry of stowing containers on the deck of properly fitted vessels was also such that consent by the shipper to on-deck carriage might be inferred. Accordingly, the stow-

---

62. Hopkins trial testimony; Lutes trial testimony.

63. Def. Ex. V (*Pacific Shipper,* August 1985); Letteney trial testimony.

age on deck of Aydin's shipment did not constitute a deviation from the contract of carriage.

## 2. *Reasonableness*

■ Even were it determined that it was a deviation to carry the subject cargo on deck, I would still find that such a deviation was reasonable under the circumstances, and thus that Westwood could still rely on the $500-per-package liability limitation. *See* COGSA, 46 U.S.C. § 1304(4) ("any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage").

The leading case in this circuit on the question of whether on-deck carriage of cargo is reasonable under the circumstances is *Du Pont de Nemours International S.A. v. S.S. Mormacvega*, 493 F.2d 97 (2d Cir.1974). The facts in *Du Pont* concerning the type of vessel involved as well as the stowage practices of the carrier are very similar to those in the instant case.[64] In *Du Pont*, however, the defendant carrier conceded that stowage of the cargo (a container of synthetic resin liquid that was lost overboard at sea) on deck was a deviation, but contended that it was entitled to rely on the liability limitation because such stowage was not unreasonable.

Stating that the "district court appropriately made a factual inquiry as to the reasonableness of the deviation," *id.* at 102, the Court of Appeals found that on even a cursory consideration of the kinds of risks associated with on-deck and under-deck stowage it was evident that had the container been stowed with the break bulk cargo below it would have been subject to dangers inherent in such carriage—including damage due to shifting by the break bulk. *Id.* The Court also stated its agreement with the proposition that "while a clean bill of leading imports below deck stowage, nevertheless stowage elsewhere will be held to be an unreasonable deviation only when a ship's hold is the ordinary and contemplated stowage area." *Id.* at 103. The Court concluded "under the circumstances of [the] case, and particularly in view of the special construction of the ship and the type of cargo involved, that on deck stowage of the Du Pont container was excusable, justifiable and therefore reason-

---

**64.** Liberal quotation from the facts of *Du Pont* will serve to illustrate the similarities with the instant case:

> In 1966 the *Mormacvega* was reconstructed, refitted and converted into a combination "break-bulk" and containerized cargo vessel. At that time containerized shipping, although still in an embryonic stage, was gaining acceptance in the North Atlantic trade. Substantial structural changes were made in the *Mormacvega* to permit on deck stowage of ocean shipping containers.
>
> \* \* \* \* \* \*
>
> The conversion contemplated that most of these would be stowed on deck. There was space in the hold, however, to accommodate the equivalent of approximately 35 containers.
>
> To determine whether a particular container would be stowed on or below deck, a procedure dictated primarily by the practical necessities of the trade and to some extent by chance was used. If there was a large amount of break-bulk cargo, few if any containers would be stowed below. If the break-bulk cargo permitted container stowage in the hold, [the carrier] considered other factors in determining container placements. Whenever possible, depending on the port of call at which a given container was to be unloaded and the time of its delivery for onloading, heavier containers were stowed below to maintain optimum stability of the vessel. Containers with flammable or explosive materials generally were stowed on deck. Cargo which was likely to suffer from exposure to the elements was stowed below to the extent possible. Cargo which was delivered to the pier after the loading process had begun of necessity was stowed on deck.
>
> In view of this procedure and the fact that cargo often was received at the pier before a complete stowage plan had been formulated or after initial placements made change impractical, it was impossible for [the carrier] to determine with any degree of certainty where a given container would be stowed. For this reason, it was [the carrier's] practice, and that of other carriers, to issue clean bills of lading to shippers even when it was possible or likely that a given container would be stowed on deck.

493 F.2d at 99 (footnote omitted).

able within the meaning of ... COGSA." *Id.*

EEV argues that stowage on deck was unreasonable because (1) an over-height, open top container, which must be stowed in the top tier of its column, will be exposed to wind and water at sea;[65] (2) such conditions are very dangerous to sensitive cargo such as electronic equipment; (3) the tarpaulin cover on an open top container containing over-height cargo is distorted, so that it offers less protection from the elements than a normal open top container; (4) Westwood could have provided as part of its preliminary stowage plan that the subject cargo would be carried below deck; and (5) even upon arrival in Oakland it was possible to have replaced one of the containers stowed under hatch 2 with the open top container.

Although EEV's arguments have merit, I conclude under the standards expressed in *Du Pont* that stowage on deck was not unreasonable. As an initial matter, I find that the Hoegh Mallard's hold was not the "ordinary and contemplated stowage area for container cargo" on an east-bound voyage. Second, while EEV is certainly correct as to the significant risks from wind and water to which an over-height open top container of sensitive cargo is exposed,[66] there was evidence presented that the risks of stowing an over-size container under deck without sufficient clearance—or free space between cargo and hatch cover— would also pose significant risks of crushing damage to the cargo.

Captain Fossem testified by deposition that the 9½ inches of free space that would have remained had the open top container been stowed below hatch 2 would not have been sufficient for safe carriage during an ocean voyage.[67] Philip Lutes, Westwood's operations manager, testified that he would require 12 inches of clearance where containers are stowed on top of break bulk cargo, since containers stowed in this fashion are less stable than when only containers are stowed and locked together in the hold. Lutes admitted in contrast that on this type of vessel Westwood requires less clearance—as little as 5 inches—when stowing only break bulk cargo under deck.[68] Defendant's naval engineer, Philip Kimball, confirmed Lutes' testimony that stowage of mixed cargo required a foot of clearance.[69] Plaintiff's operations expert, Chester Hopkins, disagreed with the 12-inch clearance requirement described by defendant's witnesses, testifying that only 2–3 inches was required, but he admitted he had only worked with fully containerized vessels and some of his testimony was based on photographs of a fully containerized ship. However, he disputed the proposition that there was any more shifting by break bulk cargo than by containers.[70]

Although the evidence was conflicting, I find the defendant's concern about stowing over-height cargo in the circumstances presented by this voyage with any less than a foot of clearance to be genuine and well founded. I also find that the testimony at trial of Westwood's packaging expert supported the proposition that the cargo could have been packed in such a way that it could withstand the rigors of an ocean voyage even if stowed on deck. I therefore

---

**65.** Any considerations having to do with the carrier's discretionary placement of the container in a particular position on the deck would seem relevant only to the issue of the carrier's negligence, not the reasonableness of on-deck stowage.

**66.** Westwood's agent, Van Ommeren, expressed the opinion in a telex to Westwood that "SHIPPERS PRESUMABLY INITIATED USE OF OPEN TOP CONTAINER WHICH WOULD NOT OFF[ER] PROTECTION SUFFICIENT FOR SUCH CARGO." Pl. Ex. 1 at p. 3, Note (telex dated 9/9/83 from Van Ommeren to Westwood).

**67.** Def. Ex. I at 71–72 (Fossem Dep.).

**68.** Lutes trial testimony.

**69.** Kimball trial testimony.

**70.** Hopkins trial testimony.

conclude that on-deck stowage was not evidently more dangerous than below-deck stowage.

Lastly, I find from the evidence in the record that Westwood's mode of stowing container cargo on an eastbound voyage was much like that of the carrier in *Du Pont*.[71] Containers were stowed below deck only if break bulk did not fill the hull, and a variety of factors, especially the timing of loading and off-loading of cargo, influenced the carrier's decision as to which containers would be carried below deck. I therefore do not find it unreasonable that Westwood did not plan to stow the open top container below deck, particularly since the carrier did not know with certainty in advance that the cargo was over-height. I also consider Westwood's failure to stow the open top container below deck under hatch 2 at the port in Oakland—when it *did* know the cargo was over-height—to be reasonable in light of the difficulties entailed by an effort to replace one of the containers already stowed there with the open top.

For these reasons, I conclude that even were the carriage of the cargo on deck a deviation, such a deviation would have been reasonable.

\* \* \* \* \* \*

Although virtually all of plaintiff's contentions in this case have been rejected, most of them have involved close questions of fact and law, and the disposition reached here should not be taken to mean the plaintiff's position was in any way frivolous. This Memorandum constitutes my findings of fact and conclusions of law as required by Rule 52 of the Federal Rules of Civil Procedure. Accordingly, for all of the reasons expressed above, judgment should be entered for the defendant Westwood.

It is so ordered.

71. Lutes trial testimony.